[No. D009702. Fourth Dist., Div. One. May 17, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
DANA EMILE BAKER, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

¹Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of part III.

## COUNSEL

Handy Horiye, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Lilia E. Garcia and Esteban Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WIENER, Acting P. J.**—Defendant Dana Emile Baker appeals the judgment entered on jury verdicts convicting him of second degree murder with the use of a firearm. (Pen. Code, §§ 187, subd. (a), 12022.5.)[2] We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Baker was involved in cocaine trafficking. On the day Baker killed Tim Kelly, cocaine was being sold at Kelly's apartment on 51st Street in San

---

[2] All statutory references are to the Penal Code unless otherwise specified.

Diego. Some time during the afternoon of February 17, 1988, Baker and Kelly argued over drugs. The argument continued for about 10 to 15 minutes, resulting in Baker leaving with the threat that someone was going to be "capped" (shot). Between 4 p.m. and 4:25 p.m. that afternoon Steven Gauthier saw two Black men running down an alley near the apartments where Kelly lived. Baker was shooting at Kelly. Sustaining four gunshot wounds, Kelly collapsed and died. The autopsy established the fatal wound was to the upper left side of Kelly's back.

Cynthia Steenhouse witnessed the shooting. She lived in an upstairs apartment overlooking the alley. She saw Baker get out of a car and start to argue with Kelly over money and drugs. When she heard gunshots she saw Baker shooting Kelly.

Baker's trial testimony was consistent with much of the foregoing. He explained he and Kelly argued and that he returned to Kelly's apartment with a gun and some friends to get his drugs back. Baker's use of a gun was only to scare Kelly. Instead of being frightened Kelly rushed him grabbing for the gun. Baker shot toward the ground and at Kelly's legs. After struggling for the gun Kelly started to run. Baker ran also. He was scared. Baker turned himself in to the police the following morning after learning Kelly had died.

Discussion

I

■ Baker argues two police officers during two separate interrogations intentionally violated his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) in order to impeach his trial testimony thereby denying him due process of law. The Attorney General concedes the predicate of Baker's argument. The police officers who testified at the suppression hearing admitted they purposefully continued their questioning of Baker after he invoked his *Miranda* rights for the express purpose of obtaining statements to be used against him should he elect to testify at trial. Clearly Baker's admissions were taken in violation of his *Miranda* rights, and the court properly ruled they were inadmissible in the prosecution's case-in-chief. The court, however, also ruled the statements could be used to impeach Baker if he testified at trial. It is only this latter ruling that is challenged in this appeal.

Baker asks us to revisit an issue on which there is considerable precedent and, to put it mildly, conflicting points of view. Whether statements taken in violation of *Miranda* were admissible for purposes of impeachment

remained unsettled until the United States Supreme Court decided *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643]. *Harris* held statements which were inadmissible as affirmative evidence because of a failure to comply with *Miranda* could nevertheless be used for impeachment purposes to attack the credibility of a defendant's trial testimony provided the statements were not "coerced" or "involuntary." (*Harris* at pp. 224-226 [28 L.Ed.2d at pp. 3-5]; see also *Oregon* v. *Hass* (1975) 420 U.S. 714, 720-724 [43 L.Ed.2d 570, 576-578, 95 S.Ct. 1215].) The California Supreme Court adopted *Harris* in *People* v. *Nudd* (1974) 12 Cal.3d 204 [115 Cal.Rptr. 372, 524 P.2d 844]. A scant three years later, however, our high court reconsidered its position in *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272], departing from *Harris,* holding the privilege against self-incrimination guaranteed by the California constitution precludes the prosecution's use in any manner of extrajudicial statements by the defendant regardless of the statement's inculpatory or exculpatory nature. (*Id.* at p. 113.) Thus under *Disbrow* statements in violation of *Miranda* standards cannot be used either as affirmative evidence or for purposes of impeachment. (*Ibid.*)

A rare insight into the deliberative process of an individual justice is contained in Chief Justice Wright's concurring opinion explaining why he changed his earlier vote in *Nudd,* joining the majority in *Disbrow.* "When I signed *Nudd,* I was motivated primarily by my abhorrence of the possibility of perjured testimony although as a long-time trial judge I well recognized that defendants in criminal actions were prone to commit a 'little' perjury when their life or liberty was at stake. I, of course, did not condone such conduct. Further, I could not at that time conceive that evidence obtained in incidents such as the present flagrant violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 . . . and *People* v. *Fioritto* (1968) 68 Cal.2d 714 . . . would ever be presented to a trier of fact. *Miranda* articulates a sound and workable exclusionary rule which is still the law of this land. I now recognize that rule is eviscerated when police officers can ignore the duty to give the warnings or, as in the instant case, violate *Miranda* and *Fioritto* requirements knowing full well that the illegally obtained statements may be admissible for impeachment purposes if a defendant elects to testify." (*People* v. *Disbrow, supra,* 16 Cal.3d 101, 116 (conc. opn. of Wright, C. J.).)

*Disbrow* remained the rule in California until *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307]. In a four-to-three decision *May* held Proposition 8, and its "truth in evidence" component (Cal. Const. art. I, § 28, subd. (d)) abrogated the rule of *People* v. *Disbrow* and accordingly overruled *Disbrow* establishing *Harris* as the California rule.

Dissenting in *May,* Justice Mosk sets out several arguments explaining why *Disbrow* should remain the law asserting the reasoning of *Harris* is both

insufficient and unpersuasive. His opinion includes the following: " . . . [T]he *Harris* rule does not carry sufficient deterrence. In cases in which the police believe they can obtain the evidence they seek only by violating the law, the *Harris* rule practically invites unlawful conduct by allowing the prosecution to use the evidence for impeachment. By contrast, a broad exclusionary rule deters such improper police conduct by denying the prosecution any benefit that might flow therefrom. [¶] The harm threatened by the *Harris* rule has not escaped the notice of commentators. One has asserted that 'Harris permits law enforcement officials to obtain confessions or statements directly related to the issue of guilt by illegal means and hold such evidence as a warning to the accused not to take the stand and contradict his prior utterance.' (Comment [1971] 39 Geo.Wash.L.Rev. [1241], at p. 1246.) Why the police may act in this fashion is plain: 'it is widely acknowledged that a defendant—at least one without a criminal record— who takes the witness stand and tells his story has a considerably better chance of acquittal than one who stands mute.' (Dershowitz & Ely, [*Harris v. New York: Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority* (1971)] 80 Yale L.J. [1198], at p. 1220, citing authorities.) [¶] Professors Dershowitz and Ely also observe that 'The *Miranda* situation is . . . tailor-made for a sequential "try it legally—if you fail, try it illegally" approach. That is, the police can attempt to obtain a statement admissible in the case in chief by giving the required warnings. If, however, the suspect requests a lawyer, they can then (instead of honoring the request and thereby losing the statement) go on—given *Harris* —to try for uncounselled statement to use for impeachment.' (Dershowitz & Ely, *supra*, 80 Yale L.J. at p. 1220, fn. 90.)" (*People* v. *May, supra*, 44 Cal.3d 309, 333 (dis. opn. of Mosk, J.).)

Justice Mosk also said that restoring the value of statements obtained without warning suspects of their rights may well encourage police to ignore *Miranda*, concluding "the fear that *Harris* may encourage unlawful police conduct has been fulfilled."[3] (44 Cal.3d at p. 334.)

---

[3]In *James* v. *Illinois* (1990) 493 U.S. 307 [107 L.Ed.2d 676, 110 S.Ct. 648], the United States Supreme Court recently considered this factor in holding the impeachment exception to the exclusionary rule would not be expanded to permit the prosecution to use the defendant's illegally obtained statement to impeach defense witnesses other than the defendant. The court explained that to expand "the impeachment exception to *all* defense witnesses would significantly enhance the expected value to the prosecution of illegally obtained evidence. First, this expansion would vastly increase the number of occasions on which such evidence could be used . . . . [D]ue to the chilling effect identified above . . . illegally obtained evidence holds even greater value to the prosecution for each individual witness than for each defendant. The prosecutor's access to impeachment evidence would not just deter perjury; it would also deter defendants from calling witnesses in the first place, thereby keeping from the jury much probative exculpatory evidence. For both of these reasons, police officers and their superiors would recognize that obtaining evidence through illegal means stacks the deck heavily in the prosecution's favor. It is thus far more than a 'speculative possibility' that

The purpose of the foregoing is not to remake the *Harris-Nudd-Disbrow-May* wheel, but only to say that precedent makes clear that Baker's argument here is the same that the *Harris* and *May* courts have expressly rejected. In balancing the societal interest to be served by preventing police misconduct against the perceived detriment of allowing defendants to commit perjury, the *Harris* and *May* courts have decided against the latter and in favor of the former. We therefore hold the trial court's evidentiary ruling following *May* was correct.

As a judicial postscript we would have preferred history would have proved Chief Justice Wright wrong in saying *Disbrow* was necessary to avoid evisceration of the constitutional rights protected by *Miranda*. If this case is any reflection the basis for his concern was hardly theoretical. Fortunately, the trial court here was well aware of the unlawfulness of the police conduct and stated that it intended to initiate steps to prohibit the San Diego Police Department from using such procedures in the future. Presumably the court has now done so and the issue presented here is now one of academic interest only.

## II

Baker also argues the court committed reversible error by failing to instruct the jury sua sponte that the statements he gave to the police in violation of his *Miranda* rights were limited to the issue of credibility and not as evidence of his guilt. There are two appellate decisions on this issue. *People* v. *Duncan* (1988) 204 Cal.App.3d 613 [251 Cal.Rptr. 355] holds that it is error for a trial court not to admonish and instruct the jury that statements obtained in violation of *Miranda* can only be used in passing upon a defendant's credibility and not as evidence of guilt. (*Id.* at p. 621.) *People* v. *Wyatt* (1989) 215 Cal.App.3d 255 [263 Cal.Rptr. 556] holds otherwise. *Duncan* reached its conclusion after examining federal law, concluding the federal rule requires a sua sponte limiting instruction. (*Duncan* at p. 621.) *Wyatt* rejected the reasoning of *Duncan* relying on *People* v. *Nudd, supra,* 12 Cal.3d 204. *Nudd* states that "absent request by a party, there is no duty to give an instruction limiting the purpose for which evidence may be considered. [Citations.]" (*Nudd, supra,* at p. 209.)

In light of our intermediate appellate role and the reemergence of *Harris* as the governing law, we believe the California Supreme Court's statement in *Nudd* governs our decision on this issue. (*Auto Equity Sales* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].) Accordingly,

---

police misconduct will be encouraged by permitting such use of illegally obtained evidence." (At p. __ [107 L.Ed.2d at p. 687].)

pursuant to *People* v. *Wyatt, supra,* 215 Cal.App.3d 255, we hold the court did not err in failing to instruct sua sponte on the limiting aspects of Baker's statements obtained in violation of his *Miranda* rights.

## III

. . . . . . . . . . . . . . . . . . . . . .*

### DISPOSITION

Judgment affirmed.

Work, J., and Todd, J., concurred.

A petition for a rehearing was denied May 30, 1990, and appellant's petition for review by the Supreme Court was denied August 16, 1990.

---

*See footnote 1, *ante,* page 574.