[No. H018413. Sixth Dist. Apr. 14, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY WILLIAMS, Defendant and Appellant.

COUNSEL

Robert Wayne Gehring, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Asisstant Attorney General, Ronald A. Bass, Assistant Attorney General, Richard Rochman and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WUNDERLICH, J.—

### I. *Statement of the Case*

A jury convicted defendant Anthony Williams of four counts of second degree armed robbery and being a felon in possession of a firearm. (Pen. Code, §§ 211, 212.5, subd. (c), 12021.1, subd. (a), 12022, subd. (a).)[1] In addition, the jury found that defendant committed the offenses while on parole for a serious or violent felony, suffered two prior "strike" felony convictions and a prior "serious felony" conviction, and served a prior prison term. (See §§ 667, subd. (a), 667, subds. (b)-(i), 667.5, subd. (b), 1170.12, 1203.085, subd. (a).) The court imposed a total sentence of 32 years as follows: five concurrent 25-year-to-life sentences, one for each offense; consecutive and three concurrent one-year arming enhancements, one for each count of robbery; a consecutive five-year enhancement for the prior "serious felony" conviction; and a consecutive one-year enhancement for the prior prison term. The court also imposed a restitution fine of $5,000 and a criminal justice administration fee of $138 and ordered any money confiscated from him be applied toward his restitution fund fine. The court gave defendant credit for 508 days of actual presentence custody and an additional 75 days of conduct credit, for a total of 583 days.

Defendant filed a timely notice of appeal from the judgment. He claims the court erred in giving standard CALJIC instructions that permitted the jury to infer guilt from his false or misleading statements to police (CALJIC No. 2.03) and from his conscious possession of recently stolen property (CALJIC No. 2.15). He also claims the court erred in imposing a one-year prior-prison-term enhancement and undercalculating the amount of pretrial custody credit to which he was entitled. We agree that the court undercalculated his custody credit, modify the judgment, and affirm the judgment as modified.

---

[1]All further statutory references are to the Penal Code unless otherwise specified.

## II. *Facts*

On the evening of November 11, 1996, Arturo Wolf, Esther Lopez, Pablo Figueroa, and Jessica Garcia were working at Little Caesar's Pizza Parlor on Branham Lane in San Jose. Around 8:30 p.m., two masked African-American men burst in through the front door. According to Figueroa and Garcia, one of the men was wearing a surgical glove. Wolf and Lopez were near the front counter and Figueroa and Garcia were in the back. One of the men jumped over the counter and pointed a gun at Wolf. Lopez ran into the back, screaming for Figueroa, but the gunman followed her and brought her, Figueroa, and Garcia back out front. The robbers demanded keys to the safe, but Figueroa and Garcia could not produce them. The robbers then settled for $120 from the cash register and Wolf's wallet and fled out the door. Figueroa immediately locked it, and Garcia called the police. The time was 8:36 p.m.

The police dispatcher broadcast information about the robbery, and upon hearing it, Officer Alexander Keller of the San Jose Police Department positioned himself on Blossom Hill about 1.4 miles from Little Caesar's. At 8:40 p.m., he spotted a white van with three African-American men in the front seat. He attempted to stop it, but the van sped up, turned onto a side street, and began to swerve. It hit the curb a few times, then turned onto another street and slowed down. As it did, the front passenger door opened, and an African-American man jumped out and ran off. According to Keller, this person was about five feet eight to five feet ten inches tall, 20 to 25 years old, and had a shaved head. He was wearing a red and blue plaid Pendleton jacket and was cradling a large bulge under the jacket. He was also holding a handgun.

Keller waited for backup officers, and when they arrived, defendant and a man named Emmanuel Earl Briggs were taken from the van, arrested, and placed in separate patrol cars.[2] Police searched the van and found a large, blue plaid flannel shirt. Inside a shirt pocket was a Montgomery Ward receipt with defendant's name on it for a battery. Next to the shirt was a plastic surgical glove. Police also found a black hooded sweatshirt. In searching the surrounding area, police found the plaid jacket worn by the man who fled from the van.

Police brought the victims to the scene, but none could positively identify either suspect. Wolf thought the blue flannel shirt found in the van looked like the one worn by a robber. He also said the two suspects were about the

---

[2]Briggs was also charged with the robberies, and the jury convicted him of being an accessory.

same size as the robbers. Garcia thought defendant's eyes looked like those of the gunman, but she did not think Briggs looked like either robber. Lopez said defendant was about the same size as one of the robbers and that the blue flannel shirt was the same type as that worn by a robber. However, she too did not think Briggs was one of the robbers. Figueroa could not identify either defendant or Briggs. At trial, Figueroa and Garcia testified that one robber wore a surgical glove and the other wore a dark glove.

When booked, defendant had neatly folded $100 bills in his wallet. No such bills were taken from the cash register at Little Caesar's. Briggs had only $8.36 on him. Police lifted fingerprints and shoe prints from the counter at Little Caesar's, but none matched defendant's or Briggs's. A week after the arrest, police found Wolf's wallet in a compartment in the back of the van. Five months later, at a lineup, none of the victims could identify defendant as one of the robbers.

*The Defense*

Defendant testified that he worked for a plumbing company and that the white van was assigned to him.[3] He explained that on the night of the robbery, he and Briggs went to Montgomery Ward's for a new car battery but stopped on the way for something to eat at a Carl's Jr., which is not far from Little Caesar's. Before they got out of the van, an African-American man opened the passenger side door, pointed a gun at Briggs, and got in. He then ordered defendant to "get the 'F' out of there," directing him onto Blossom Hill. Within minutes, a patrol car started to follow them, and the man ordered defendant to turn. Defendant tried to pull over to the curb once or twice, but the man ordered him to keep going. Moments later, the man went into the back of the van. Defendant thought he was about to be hit or shot and let go of the steering wheel, causing the van to hit the curb. The man then returned to the front, ordered defendant do slow down, and then jumped out and ran.

The police arrived and ordered defendant and Briggs out of the van, handcuffed them, and put them in different patrol cars. Defendant testified that when he was in the patrol car, an officer asked if he knew what was going on. According to defendant, he said he did not know and then told the officer he had just been carjacked, specifically, that "I was going to get a bite to eat at Carl's Junior, [and a] guy walked up to our van, put a gun in [*sic*] my head and told me to drive."

Later, while he sat in a holding cell, an officer told defendant he was being booked for armed robbery and asked if he had anything to say.

---

[3]Briggs worked as a security guard at a mall near Little Caesar's.

Defendant said he wanted to talk to a lawyer. The officer said police had defendant's shoe print from the restaurant counter. Defendant responded, "You do a full investigation and thorough because you'll find out I didn't have anything to do with any robbery."

At trial, defendant denied robbing Little Caesar's, or even knowing where it was located. Defendant admitted that his size and eye color were similar to one of the suspects. He admitted that the blue plaid shirt found in the van belonged to him. And he admitted that he uses surgical gloves for work. However, he did not know about the glove in the back of the van. Defendant also admitted prior convictions for voluntary manslaughter with personal use of a gun and for assault with a gun, arising from the same incident.

### Rebuttal

Officer Mike Enoos of the San Jose Police Department testified that he spoke to defendant while defendant was handcuffed in the back of the patrol car. At that time, defendant said that the carjacker had approached him and Briggs as they were walking to Carl's Jr.[4]

### III. *CALJIC No. 2.03*

In instructing the jury, the trial court gave CALJIC No. 2.03, which allows the jury to consider any "willfully false or deliberately misleading" statement made by a defendant after arrest "as a circumstance tending to prove a consciousness of guilt."[5] According to defendant, this instruction allowed jurors to consider his explanation to Officer Enoos about the carjacking as evidence of guilt if they found that it was false or misleading. Defendant points out that he spoke to Enoos before receiving any *Miranda*[6] advisements. Thus, he claims that giving CALJIC No. 2.03 violated the general rule that prohibits the prosecution from using "un*Mirandized*" statements to prove guilt. (See *Miranda v. Arizona, supra,* 384 U.S. 436.)

---

[4]Defendant denied telling police that the carjacker approached him as he and Briggs were walking to the restaurant. He opined that the police misinterpreted what he had said to them. According to defendant, the police "thought I was already out [of] the car because I said I was about to walk into Carl's Junior because what I was going to do when I stopped. I didn't know I would have to tell him details like I cut the ignition off, opened the door, got out, took two steps."

[5]CALJIC No. 2.03 states, "If you find that before this trial a defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

[6]*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

■ In *Miranda v. Arizona, supra,* 384 U.S. 436 (hereafter *Miranda*), the United States Supreme Court observed that when an individual is subjected to custodial interrogation, his or her Fifth Amendment privilege against self-incrimination is jeopardized. To protect it as well as the exercise of the rights to remain silent and to have an attorney, the court established certain procedural rules for law enforcement officers to follow when questioning an arrestee. Specifically, police must warn an arrestee before any questioning that he or she has the right to remain silent, that anything he or she says can be used against him or her in a court of law, that he or she has the right to the presence of an attorney, and that if he or she cannot afford an attorney one will be appointed for him or her prior to any questioning if he or she so desires. The arrestee must then be given the opportunity to exercise these rights throughout the interrogation. Thereafter, the arrestee may waive these rights and agree to answer questions or make a statement. On the other hand, if the arrestee invokes the right to remain silent or requests the assistance of counsel, then questioning must cease unless and until an attorney is provided or the arrestee makes it clear that he or she wants to give a statement and do so without counsel. (*Id.* at pp. 473-474, 478-479 [86 S.Ct. at pp. 1627-1628, 1629-1631]; see *Edwards v. Arizona* (1981) 451 U.S. 477, 482, 484-485 [101 S.Ct. 1880, 1884-1885, 68 L.Ed.2d 378].) ■ As further prophylaxis, the court promulgated an exclusionary rule: Unless and until the prosecution demonstrates that *Miranda* warnings were given and the specified rights were waived, it may not introduce at trial any evidence obtained as a result of custodial interrogation (hereafter, the *Miranda* rule). (*Miranda, supra,* 384 U.S. at pp. 444, 479 [86 S.Ct. at pp. 1612, 1630-1631].)[7]

Since *Miranda,* the high court has reexamined, and limited, the sweeping effect of the *Miranda* rule. (See *People v. Simpson* (1998) 65 Cal.App.4th 854, 859 [76 Cal.Rptr.2d 851], and authorities cited there.) Pertinent here is *Harris v. New York* (1971) 401 U.S. 222 [91 S.Ct. 643, 28 L.Ed.2d 1] (hereafter *Harris*). ■ In *Harris,* the court held that although the prosecution may not introduce an un*Mirandized* statement as part of its case-in-chief, it may use such a statement to impeach a defendant's inconsistent testimony, if he or she elects to testify. The court explained that "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. [Citations.] Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third

---

[7]We use the term "un*Mirandized* statement" to refer to statements obtained in violation of *Miranda,* whether the violation be, as here, the failure to give *Miranda* advisements and (or) obtain a proper waiver, or the failure to heed an invocation of those rights.

person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment. [¶] The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." (*Id.* at pp. 225-226 [91 S.Ct. at pp. 645-646], fn. omitted.)

In support of its analysis, the court cited *Walder v. United States* (1954) 347 U.S. 62 [74 S.Ct. 354, 98 L.Ed. 503], a Fourth Amendment case, where the court permitted physical evidence, inadmissible in the case-in-chief, to be used for impeachment purposes. In *Walder*, the court stated, "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. . . . [¶] . . . [T]here is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." (*Id.* at p. 65 [74 S.Ct. at p. 356].)

In *Harris,* the court found no "difference in principle" between *Walder* and the circumstances before it. (*Harris, supra,* 401 U.S. at p. 225 [91 S.Ct. at p. 645].) The court further opined that the impeachment process provided a "valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." (*Ibid.* [91 S.Ct. at p. 645].)

In the case before us, defendant testified on direct examination that when he was sitting in the patrol car after his arrest, "[a] police officer came to talk to me. He asked me do I know what was going on. I told him no. [I] told him I just got carjacked. I was going to get a bite to eat at Carl's Junior, [and a] guy walked up to our van, put a gun in [*sic*] my head and told me to drive." It is undisputed that this statement to Officer Enoos was un*Mirandized.* The issue, therefore, is whether the *Miranda* rule prohibits an instruction that allows the jury to draw an inference of guilt from a willfully false or deliberately misleading un*Mirandized* statement that the defendant voluntarily introduces into evidence on direct examination.[8]

*Miranda* and *Harris* address the circumstances under which the prosecution may introduce a defendant's un*Mirandized* statement. Neither case

---

[8]We focus our discussion on defendant's statement to Enoos. As noted, however, defendant also testified that while he was in a holding cell, an officer told him that police had a shoe print of his taken from the counter at Little Caesar's. According to defendant, he responded

involved or discussed the proper scope of instructions and argument where, as here, *the defendant* introduces such a statement. Consequently, we do not find either case controlling on whether it was proper to give CALJIC No. 2.03. (See *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 943 [55 Cal.Rptr.2d 724, 920 P.2d 669]; *People v. Ceballos* (1974) 12 Cal.3d 470, 481 [116 Cal.Rptr. 233, 526 P.2d 241] [cases are not authority for issues not considered and resolved].) However, the question remains whether the *Miranda* rule should apply under the circumstances to bar the instruction. We think not.

The analysis and policy considerations that prompted the court in *Harris* to permit the use of an un*Mirandized* statement for impeachment apply with equal force here. As *Harris* explains, a defendant has no right to commit perjury at trial without the risk of being subjected to a traditional form of impeachment via prior inconsistent statements. Thus, a defendant ought not be able to use the *Miranda* rule as a shield to protect perjurious, exculpatory trial testimony from impeachment by a prior inconsistent un*Mirandized* statement.

Similarly, we do not believe a defendant may introduce his or her own false statement, whether or not obtained in violation of *Miranda*, presumably to bolster his or her defense, and escape the inherent risks associated with any other evidence presented by the defense, among them, the risk that a prior false statement may be the basis for an inference of wrongdoing.[9] Deliberately false statements to the police about matters that are within an arrestee's knowledge and materially relate to his or her guilt or innocence

by saying, "You do a full investigation and thorough because you'll find out I didn't have anything to do with any robbery."

Defendant notes that this statement is, in essence, a mere denial of wrongdoing. Citing *People v. Edwards* (1992) 8 Cal.App.4th 1092, 1101-1104 [10 Cal.Rptr.2d 821], he claims that CALJIC No. 2.03 applies to false explanations about one's conduct, not a straight denial of guilt.

*Edwards* did not involve this issue and thus is not authority for defendant's claim. However, even if we assume for purposes of argument that the instruction should not be given where the only allegedly false statement is a mere denial of guilt, any error in giving the instruction would be harmless under any standard. The instruction would apply only if the jury found the denial to be false, and this would necessarily mean that the jury accepted the prosecution's evidence and rejected the defense case. Under such circumstances, the inference of guilt arising from a "false" denial of guilt could add nothing to the jury's evaluation of the evidence and determination of guilt.

[9]Evidence Code section 1236 authorizes the admission of hearsay if the statement is consistent with a witness's trial testimony and is offered in compliance with Evidence Code section 791. Evidence Code section 791 allows a prior consistent statement if offered after "[a]n express or implied charge has been made that [the witness's] testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791, subd. (b).)

have long been considered cogent evidence of a consciousness of guilt, for they suggest there is no honest explanation for incriminating circumstances. (See *People v. Osslo* (1958) 50 Cal.2d 75, 93 [323 P.2d 397].) Moreover, permitting the jury to draw an inference of wrongdoing from a false statement is as much a traditional feature of the adversarial fact finding process as impeachment by prior inconsistent statements. (See 2 Wigmore, Evidence (Chadbourn ed. 1979) § 278, pp. 133-141; 1 Witkin, Cal. Evidence (3d ed. 1986) The Hearsay Rule, § 657, pp. 642-643; see also *People v. Kimble* (1988) 44 Cal.3d 480, 496-498 [244 Cal.Rptr. 148, 749 P.2d 803]; *People v. Albertson* (1944) 23 Cal.2d 550, 581-582 [145 P.2d 7] (conc. opn. of Traynor, J.).) ▮▮▮ In our view, therefore, a defendant ought not be able to introduce an un*Mirandized* statement to exploit its ostensible exculpatory content and then invoke the *Miranda* rule to prevent the jury from drawing an inference of guilt if it finds that the statement was willfully false or deliberately misleading. (Cf. *People v. Robinson* (1997) 53 Cal.App.4th 270, 281-282 [61 Cal.Rptr.2d 587] [cross-examination about otherwise inadmissible confession proper where defendant testifies that he did not confess].)

It should be noted that defendant easily could have avoided any inference of wrongdoing from his un*Mirandized* statement. The *Miranda* rule would have barred the prosecution from introducing the contents of the statement during its case-in-chief. Thus, unless defendant introduced it, there would have been no evidentiary basis for CALJIC No. 2.03. And although the prosecution was permitted to introduce that part of defendant's statement to Enoos about where the alleged carjacker approached him and Briggs, this detail was admitted under *Harris,* not as evidence of guilt but solely to impeach defendant's prior inconsistent trial testimony. (See *Hinman v. McCarthy* (9th Cir. 1982) 676 F.2d 343 [error to give CALJIC No. 2.03 based on evidence admitted under *Harris* exception].)

▮▮▮ We further note that CALJIC No. 2.03 does not require the jury to draw an inference of wrongdoing or permit the unrestrained use of an un*Mirandized* statement. On the contrary, before drawing any inference, the jury must first find that the defendant's statement was willfully false or deliberately misleading. Furthermore, the instruction does not ascribe any particular importance to the evidence but permits the jury to decided what weight or significance, if any, should be given the false statement. In addition, the instruction expressly forbids the jury from basing a conviction *solely* on the fact that the defendant made a false statement.

▮▮▮ Last, we do not find that the benefits of applying the *Miranda* rule under the circumstances outweigh its burden on the factfinding process. In

Here, defendant introduced his prior un*Mirandized* statement without an objection from the prosecution that the foundational requirements for a prior consistent statement had been satisfied.

our view, the probative value of an inference of wrongdoing, like that of impeachment evidence, should not be lost simply because police might be tempted to violate *Miranda* in order to obtain a false statement. Rather, as the court opined in *Harris,* "Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." (*Harris, supra,* 401 U.S. at p. 225 [91 S.Ct. at p. 645].) We consider it no more likely that police will violate *Miranda* to obtain testimony subject to CALJIC No. 2.03 than they would to obtain testimony for impeachment purposes. (But see *People v. Bey* (1993) 21 Cal.App.4th 1623 [27 Cal.Rptr.2d 28] [court troubled by apparently intentional violation of *Miranda* to obtain impeachment statements].) Indeed, as discussed above, CALJIC No. 2.03 could not be given unless the defendant volunteers his own false un*Mirandized* statement at trial.

In sum, defendant's testimony about what he said to Enoos combined with the prosecution's evidence of guilt supported CALJIC No. 2.03. We conclude that giving this instruction violated neither the letter nor spirit of the *Miranda* rule.

Defendant asserts that the fact he first brought the contents of his statement before the jury is irrelevant. Citing *Duran v. Stagner* (N.D.Cal. 1985) 620 F.Supp. 803, he claims *Miranda* and *Harris* prohibit the affirmative use of an un*Mirandized* statement by the prosecution no matter who introduces it. We disagree.

In *Duran*, the defendant testified about what happened during the incident that caused his arrest. He also said he had given a false statement to the police. However, he did not reveal the contents of this statement. As rebuttal to impeach the defendant's trial testimony, the prosecution introduced the un*Mirandized* statement. Thereafter, the trial court gave CALJIC No. 2.03. (*People v. Duran* (1983) 140 Cal.App.3d 485, 493 [189 Cal.Rptr. 595], review den. June 2, 1983, cert. den. *Duran v. California* (1983) 464 U.S. 991 [104 S.Ct. 481, 78 L.Ed.2d 679]; *Duran v. Stagner, supra,* 620 F.Supp. at p. 804.) After the defendant's conviction was affirmed on appeal, he sought a federal writ of habeas corpus, claiming that the court erred in giving CALJIC No. 2.03. The district court agreed. As noted, the prosecution introduced the contents of defendant's statement for impeachment as permitted by *Harris*. The district court reasoned that CALJIC No. 2.03 permitted the jury to use the statement for a purpose—drawing an inference of guilt—not authorized by *Harris*. (*Duran v. Stagner, supra,* 620 F.Supp. at p. 805; see *Hinman v. McCarthy, supra,* 676 F.2d 343 [cited in *Duran*]; *U.S. v. Quiroz* (2d Cir. 1993) 13 F.3d 505.)

*Duran* is distinguishable because there, the prosecution introduced the contents of an un*Mirandized* statement under *Harris,* and here defendant voluntarily introduced his statement for his own purposes. Moreover, the *Duran* court said nothing to suggest it would have reached the same conclusion on the facts of this case.

Defendant claims that giving CALJIC No. 2.03 permitted the jury to consider Enoos's testimony about what defendant said as evidence of guilt even though it was admitted under *Harris* for impeachment only. We disagree.

As defendant acknowledges, the trial court instructed the jury as follows: "If you find that a defendant, following his arrest, made a statement or statements to a law enforcement officer or officers, inconsistent with that defendant's trial testimony, the out-of-court statement must be considered by you *only* for the purpose of testing that defendant's credibility as a witness. *You must not consider the statement as evidence of guilt."* (See CALJIC No. 2.13.1, italics added.)

Because the trial court properly gave CALJIC No. 2.03 and the limiting instruction quoted above, the most defendant may reasonably say is that the court should have modified CALJIC No. 2.03 to *expressly* prohibit consideration of Enoos's testimony. However, defendant waived any such complaint by failing to request a modification. (See Evid. Code, § 355.) Indeed, absent a request, the trial court has no duty to give a limiting instruction concerning the proper use of a statement admitted under the *Harris* exception. (*People v. Torrez* (1995) 31 Cal.App.4th 1084, 1090-1091 [37 Cal.Rptr.2d 712]; *People v. Baker* (1990) 220 Cal.App.3d 574, 580 [269 Cal.Rptr. 475]; *People v. Wyatt* (1989) 215 Cal.App.3d 255, 258 [263 Cal.Rptr. 556]; *People v. Duran, supra,* 140 Cal.3d at p. 494; see *People v. Nudd* (1974) 12 Cal.3d 204, 208-209 [115 Cal.Rptr. 372, 524 P.2d 844], overruled on other grounds in *People v. Disbrow* (1976) 16 Cal.3d 101, 113 [127 Cal.Rptr. 360, 545 P.2d 272], abrogated by Prop. 8; but see *People v. Duncan* (1988) 204 Cal.App.3d 613, 621 [251 Cal.Rptr. 355] [court has sua sponte duty].)

In any event, even assuming that CALJIC No. 2.03 theoretically applied to both defendant's *and* Enoos's testimony, the more specific *Harris* instruction quoted above applied *only* to Enoos's testimony, which related a detail inconsistent with defendant's trial testimony. Because this specific instruction prohibited the jury from considering Enoos's testimony as evidence of guilt, we find no reasonable likelihood that the jury would have been confused about whether CALJIC No. 2.03 also applied to Enoos's testimony.

(See *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [112 S.Ct. 475, 482, 116 L.Ed.2d 385]; *People v. Cain* (1995) 10 Cal.4th 1, 36 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) Indeed, we presume jurors are able to and do follow the court's limiting instructions. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d 84].)

Moreover, even if there were such a reasonable likelihood, we would find any prejudice from the instructional ambiguity harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; cf. *People v. Torrez, supra,* 31 Cal.App.4th 1084 [any error in giving CALJIC No. 2.13 harmless beyond a reasonable doubt].) The detail about where the carjacker approached defendant and Briggs constituted an insignificant part of defendant's version of events. There was no reasonable basis for a juror to find that defendant deliberately lied about the detail but otherwise told the truth about what happened. On the contrary, if the jury found the detail false, it would be because it found the whole story was false. Moreover, the jury was properly allowed to draw an inference of guilt from defendant's testimony and properly allowed to consider the detail and defendant's two prior felony convictions in determining his credibility. Under the circumstances, the prejudicial impact of an improper inference of guilt drawn from the detail would, in our view, be imperceptible.[10]

## IV. *CALJIC No. 2.15*

As noted above, police found Arturo Wolf's wallet in the back of defendant's van. █ At trial, the court gave CALJIC No. 2.15, which allows an inference of guilt if the jury finds that (1) a defendant had "conscious possession of recently stolen property" and (2) there is additional corroborating evidence of guilt. Defendant notes that he testified to the effect that the carjacker must have hid the wallet in the back of the van. Relying primarily on *People v. Morris* (1988) 46 Cal.3d 1 [249 Cal.Rptr. 119, 756 P.2d 843], defendant contends it was error to give CALJIC No. 2.15 because there was conflicting evidence about whether he had *conscious* possession of Wolf's wallet—i.e., knowing dominion and control. This claim is meritless.

In *Morris*, a witness testified that the defendant looked like the man who presented a particular credit card, which, other evidence revealed, the victim

---

[10]In his brief, defendant focuses on CALJIC No. 2.03. However, he suggests that the court also erred in giving CALJIC Nos. 2.71 (definition of admission) and 2.72 (admission insufficient by itself to support conviction) because these instructions permitted the jury to consider his direct testimony about his statements as evidence of guilt. We reject this suggestion for the same reasons we reject defendant's claim concerning CALJIC No. 2.03.

had previously possessed. (*People v. Morris, supra*, 46 Cal.3d at p. 40.) The trial court gave a former version of CALJIC No. 2.15, instructing the jury that " '[t]he mere fact that a person was in conscious possession of recently stolen property is not enough to justify his conviction of the crimes charged in the information. [¶] It is, however, a circumstance to be considered in connection with other evidence. To warrant a finding of guilty, there must be proof of other conduct or circumstances tending of themselves to establish guilt.' " (*People v. Morris, supra*, at p. 40, fn. 16; see *People v. Anderson* (1989) 210 Cal.App.3d 414, 420, fn. 1 [258 Cal.Rptr. 482] [discussing the instruction as it read in 1988].) Citing *People v. Rubio* (1977) 71 Cal.App.3d 757 [139 Cal.Rptr. 750], disapproved on other grounds in *People v. Freeman* (1978) 22 Cal.3d 434, 438 [149 Cal.Rptr. 396, 584 P.2d 533], the California Supreme Court stated, that "where the evidence relating to 'possession' is conflicting or unclear, an *unqualified* instruction pursuant to CALJIC No. 2.15 should not be given, for it could easily mislead the jury into assuming that the defendant's possession has been established when, in actuality, the issue is in doubt." (*People v. Morris, supra*, 46 Cal.3d at p. 40, disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543-545, fns. 5, 6 [37 Cal.Rptr.2d 446, 887 P.2d 527], italics added.)[11]

As defendant correctly observes, there was conflicting evidence on the issue of his conscious possession of the wallet: either he stole it or he was unaware that the carjacker had stashed it in the van. However, unlike the instruction in *Morris* (and *Rubio*), the court's instruction here was not "unqualified" in a way that might imply that defendant did in fact possess Wolf's wallet. Rather, the instruction permitted an inference of guilt *only if* the jury first found that defendant was in conscious possession of the wallet and there was additional corroborating evidence of guilt. Moreover, the court later warned the jury against inferring the existence of any fact from either its instructions or statements and directed the jury to disregard instructions that were applicable only to a certain state of facts if it did not find that state of facts to be true. (See CALJIC Nos. 17.30 and 17.31.) Under the circumstances, we find no reasonable likelihood that the jury would have thought it could infer guilt even if it believed defendant's version of events. (See *Estelle v. McGuire, supra*, 502 U.S. at p. 72 [112 S.Ct. at p. 482]; *People v. Cain, supra*, 10 Cal.4th at p. 36.) Thus, the court properly gave CALJIC No. 2.15. Moreover, given the court's cautionary instructions, we would find any potential misunderstanding harmless. (See *People v. Morris, supra*, 46 Cal.3d at p. 41 [finding the error harmless].)

---

[11]*People v. Rubio, supra*, 71 Cal.App.3d 757 involved the same instruction given in *Morris*. (*Id.* at p. 767.) There, stolen money was found on the ground near where the defendant was arrested. The court concluded it was error to give the instruction because it implied that the defendant's possession of the money had been established. (*Id.* at p. 768.)

Defendant also claims that CALJIC No. 2.15 denied him due process. Citing *Barnes v. United States* (1973) 412 U.S. 837 [93 S.Ct. 2357, 37 L.Ed.2d 380], he claims that the traditional, common law rule, recognized by the United States Supreme Court, permits an inference of guilt from three foundational facts: recently stolen property, the defendant's possession of it, and the lack of an explanation. Defendant points out that CALJIC No. 2.15 permits an inference from (1) a finding of "conscious possession of recently stolen property" and (2) corroborating evidence, including a lack of explanation; the time, place, and manner of possession; the defendant's opportunity to commit the charged offense; the defendant's conduct or statements concerning the property; a false explanation for possession; or other evidence connecting the defendant to the crime. Defendant claims that by shifting the "lack of explanation" factor from a *foundational* requirement to merely one of any number of alternative corroborating factors, CALJIC No. 2.15 lessens the prosecution's burden of proof. Indeed, the prosecution need not establish the lack of an explanation at all. Thus, defendant claims the instruction denied him due process of law. This claim is meritless.

*Barnes* does not suggest that the failure to explain possession of recently stolen property is a constitutionally mandated foundational requirement for drawing an inference of guilt. Nor does *Barnes* suggest that no circumstances other than the lack of an explanation can combine with conscious possession of recently stolen property to support an inference of guilt. Rather, as CALJIC No. 2.15 acknowledges, an inference of guilt may rationally arise from the concurrence of conscious possession and many other circumstances. For example, where the evidence supports a finding that an arrestee had stolen property in his pocket a short time after a robbery and that the arrestee was seen approaching the victim a short time before the robbery, the inference of guilt is reasonable, if not compelling, regardless of whether or not the arrestee explained how he obtained the property. Moreover, this inference is reasonable even if the arrestee gives a plausible explanation for having the property. ■ In our view, CALJIC No. 2.15 correctly prohibits the jury from drawing an inference of guilt solely from conscious possession of recently stolen property but properly permits the jury to draw such an inference where there is additional corroborating evidence. As long as the corroborating evidence together with the conscious possession could naturally and reasonably support an inference of guilt, and that inference is sufficient to sustain a verdict beyond a reasonable doubt, we discern nothing that lessens the prosecution's burden of proof or implicates a defendant's right to due process. Indeed, CALJIC No. 2.15 has repeatedly withstood challenges on the grounds that it lessens the burden of proof or otherwise denies a defendant due process of law. (See, e.g., *People v. Smithey* (1999) 20 Cal.4th 936 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *People*

*v. Holt* (1997) 15 Cal.4th 619 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Hernandez* (1995) 34 Cal.App.4th 73 [40 Cal.Rptr.2d 223]; *People v. Esquivel* (1994) 28 Cal.App.4th 1386 [34 Cal.Rptr.2d 324], *People v. Gamble* (1994) 22 Cal.App.4th 446 [27 Cal.Rptr.2d 451]; *People v. Anderson, supra,* 210 Cal.App.3d 414.)

## V. *Prior Prison Term Enhancement*[12]

Defendant contends the court erred in imposing a one-year prior-prison-term enhancement based on the period of time he spent at the California Youth Authority (CYA). We disagree.

The record reveals that the enhancement was based on a 1989 conviction for assault with a firearm defendant committed when he was 18 years old. At sentencing, the court imposed a three-year term for the assault and stayed it. The abstract of judgment states, "Recommend housing at CYA pursuant [to Welfare and Institutions Code] § 1731.5." It also states, "Defendant is remanded to the custody of the sheriff, to be delivered[] upon acceptance by CYA [to the] California Youth Authority." In October 1989, defendant was accepted and received by CYA, where he remained until he was paroled in 1995.

When defendant was sentenced for the assault, section 1731.5, subdivision (a), authorized the trial court to directly commit persons who, when arrested, were under 21 years old, to CYA. (See Stats. 1987, ch. 354, § 1, pp. 1466-1467.) Section 1731.5, subdivision (c), permitted the Director of Corrections to transfer persons under 21 years old to CYA. That section also permitted the court to order that such persons be housed at CYA for the duration of their prison term. In pertinent part, the section provided, "In sentencing a person under the age of 21 years, the court may order that the person shall be transferred to the custody of the Youth Authority pursuant to this subdivision. When the court makes such an order and the Youth Authority fails to accept custody of the person, the person shall be returned to court for resentencing. The transfer shall be solely for the purposes of housing the inmate, allowing participation in the programs available at the institution by the inmate, and allowing Youth Authority parole supervision of the inmate, who, in all other aspects shall be deemed to be committed to

---

[12]Unless otherwise specified, all statutory references in this section are to the Welfare and Institutions Code.

the Department of Corrections and shall remain subject to the jurisdiction of the Director of Corrections and the Board of Prison Terms."[13]

 It is settled that a direct commitment to CYA under section 1731.5, subdivision (a), in lieu of a prison term is not a "prior prison term" for the purposes of enhancement under Penal Code section 667.5, subdivision (b). However, a transfer to CYA for housing either by the court at sentencing or later by the Director of Corrections under section 1731.5, subdivision (c) is a "prior prison term." (*People v. Seals* (1993) 14 Cal.App.4th 1379, 1382-1385 [18 Cal.Rptr.2d 676].)

The record here reveals that in 1989, the trial court did not commit defendant directly to the CYA in lieu of a prison term. Rather, it imposed a prison term and then, under the authority of section 1731.5, subdivision (c), ordered that defendant be immediately transferred to CYA for "housing." Thus, defendant's CYA commitment was a "prison term" within the meaning of Penal Code section 667.5, subdivision (b), and the court below properly imposed a one-year enhancement.

Defendant cites the *current* version of section 1731.5, subdivision (c), under which, the Department of Corrections may transfer a person under the age of 18 years to the CYA for housing. He argues that this section was inapplicable because he was over 18 when sentenced and the record contains no transfer by the Department of Corrections. Thus, it follows that he must have been committed to the CYA under subdivision (a). This argument is meritless. Defendant was sentenced under the former version of section 1731.5 quoted above, which applied to those under 21 years of age. Moreover, as noted above, transfer to the CYA may be ordered not only by the Department of Corrections after a defendant is sent to prison but also in the first instance by the court at sentencing.

### VI. *Pretrial Custody Credit*

Defendant contends that because his current offenses were not "violent" offenses within the meaning of section 667.5, subdivision (c), the amount of presentence conduct credit to which he was entitled should have been calculated pursuant to Penal Code section 4019, rather than section 2933.1, which limited credit to 15 percent of actual time. Under section 4019, he

---

[13]The age of eligibility for transfer to CYA was lowered in 1996 from 21 to 18 years. (See Stats. 1996, ch. 195, § 1.)

would be entitled to 254 days of credit, rather than the 75 days credited by the court.[14]

The People agree with defendant that section 4019 governs the calculation of credit in this case and concede that he is entitled to 254 days of credit. (See *People v. Thomas* (1999) 21 Cal.4th 1122, 1130 [90 Cal.Rptr.2d 642, 988 P.2d 563].) We also agree and modify the judgment accordingly.

## VII. *Disposition*

The judgment is modified to give defendant credit for 508 days of actual custody and 254 days of good conduct credit for a total of 762 days. As modified, the judgment is affirmed. The trial court is directed to amend the abstract of judgment to reflect the modification, and to send a copy of the amended abstract to the Department of Corrections.

Bamattre-Manoukian, Acting P. J., and Mihara, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 9, 2000. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

[14]Under section 4019, presentence conduct credit is calculated "by dividing the number of days spent in custody by four and rounding down to the nearest whole number. This number is then multiplied by two and the total added to the original number of days spent in custody. [Citation.]" (*People v. Fry* (1993) 19 Cal.App.4th 1334, 1341 [24 Cal.Rptr.2d 43].)

Thus, defendant's 508 days of actual credit, divided by four equals 127, times two equals 254 days.