Filed 2/17/15  P. v. Mendoza CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DIOSSEL RIOS MENDOZA,<br><br>    Defendant and Appellant. | H039101<br>(Santa Clara County<br>Super. Ct. No. C1093346) |
| In re DIOSSEL RIOS MENDOZA,<br><br>    on Habeas Corpus. | H041324 |

Defendant Diossel Rios Mendoza appeals from his conviction for sexual penetration of a child under the age of 10 years in violation of Penal Code section 288.7, subdivision (b).[1]  On appeal, defendant raises four claims of instructional error.  He also argues that his trial counsel was constitutionally ineffective.  In a petition for a writ of habeas corpus, which we have ordered considered together with the appeal, defendant asserts that his trial counsel rendered ineffective assistance of counsel and that this court deprived him of due process by denying his request for funds to hire two experts in connection with the writ proceeding.

---

[1] Further unspecified statutory references are to the Penal Code.

Finding no prejudicial error, we shall affirm the judgment and deny the petition for writ of habeas corpus.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Defendant Is Charged With Molesting Victim*

On March 30, 2011, the Santa Clara County District Attorney filed an information charging defendant with sexual penetration of a child 10 years of age or younger (§ 288.7, subd. (b)).  The information alleged that between September 25, 2010 and November 26, 2010, defendant had sexually penetrated the victim, a four-year-old girl (victim).

### B.    *Evidence Adduced at Trial*

Defendant was tried on the charged offense before a jury over the course of four days in September 2012.

#### 1.    *Victim's Mother*

Victim's mother (hereafter victim's mother) testified for the prosecution.  She testified that, in the fall of 2010, she rented a room in her home to defendant, his wife, and their baby.  Victim's mother's husband and their daughter, victim, also lived in the home, as did several other families who also rented rooms.

Victim's mother had a dream that someone touched victim inappropriately.  When she asked victim if anyone had touched her, victim told her defendant had touched her privates multiple times, had masturbated in front of her, and once put his finger in her anus.  Victim's mother took victim to the hospital to be examined.  The hospital contacted the police.

On cross-examination, victim's mother denied having an affair with defendant.

#### 2.    *Victim*

Victim, who was almost seven years old at the time of trial, also testified for the prosecution.  On the stand, she stated that she did not remember defendant or anyone else touching her.  She recalled seeing defendant's penis with what she described as "milk" on

2

it.  Victim testified that a vagina is called a "palomita" and buttocks are called "fushu."

Victim's preliminary hearing testimony was admitted as prior consistent and inconsistent statements and was read into the record.  At the preliminary hearing, victim testified that a vagina is called a "colita" and buttocks are called "fushu."  She testified that defendant had put his finger inside her vagina.  She initially stated that he only touched her once, but later testified that he put his finger in her four times.  She further testified that she saw milk come out of defendant's penis and had seen naked people on the television in defendant's room on two occasions.

### 3.    *Detective Sanchez*

Omar Sanchez, a detective with the San Jose Police Department, testified that he investigated the accusations against defendant.  In connection with the investigation, Detective Sanchez interviewed victim.  Videos of Detective Sanchez's interview with victim were played at trial.  In the interview, victim stated that defendant put his fingers in her vagina (which she called "fushu") and her buttocks (which she referred to as both "cola" and "fushu").  Her recollection as to how many times he had touched her varied between two and four times.  She also stated that defendant touched his penis while touching her.  Victim recalled seeing defendant's penis with what she described as white milk coming out of it.

Detective Sanchez also interviewed defendant, who was handcuffed to the table during the interview.  An audio recording of the interrogation, which was conducted in Spanish, was played for the jury.  Transcripts of the interrogation translated into English also were distributed to jurors.

In the interrogation, after eliciting some biographical information from defendant, Detective Sanchez read defendant his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436).  Detective Sanchez asked defendant general questions about victim's mother's children, including victim, as well as some of the house's other occupants.  With respect to victim, defendant said the girl often came into his room to play with his infant son.

3

Defendant explained victim hugs him when he gets home from work and he picks her up and carries her. At that point, Detective Sanchez suggested defendant was not being entirely honest about his relationship with victim. Detective Sanchez stated: "I am also Mexican . . . that is why I am here talking with you . . . So that we can both understand each other . . . and so that I can help you, but you can also help me by being honest."

Detective Sanchez began questioning defendant directly about touching victim. Defendant repeatedly denied doing so, saying at one point "I am incapable of touching a (inaudible) a girl." Detective Sanchez falsely told defendant they found his DNA on victim. Detective Sanchez went on to say: "if you touched her, you touched her. That's fine. There isn't--you didn't rape her, okay. You--you didn't have sex, nothing like that with her. If you touched her, you touched her. That's fine, okay. . . . Like I told you, if you touched her, you touched her, that's fine. . . . I think you touched her. And if you touched her, that's fine. Just tell me what--what you did to her because if it happened, it happened."

Thereafter, defendant said he had touched victim once to lift her off his bed. Defendant explained that he was watching television in his room and victim came in to play with his son. When she got up on the bed defendant noticed her feet were dirty so he picked her up and put her on the floor. Defendant denied touching victim's vagina or buttocks in the process. He said sometimes when he picks victim up she says " 'Hey don't touch my--my,' what does she say? [']My--my fufu.['] " But defendant stated that he never intentionally touched the girl's vagina.

Detective Sanchez said he thought defendant was lying and explained, "I understand [whatever happened with victim] is something bad, okay. But like I told you it's not so serious." Defendant continued to deny touching victim inappropriately. Eventually, the conversation returned to the incident in which defendant lifted victim off his bed. Defendant explained that the girl was wearing very short shorts and no underwear and he saw her vagina. Detective Sanchez suggested that maybe defendant

4

had touched the girl's vagina as he lifted her off the bed.  Defendant responded, "[p]erhaps."  Detective Sanchez then asked defendant what victim's vagina felt like.  Defendant responded "I didn't touch.  No well because it was very quick I just . . . put her on the bed like this."  Detective Sanchez asked whether defendant could have put his fingers in victim's vagina by accident when he lifted her off the bed, saying three times "if it was an accident, it was an accident."  Defendant denied touching victim's vagina at least seven additional times.

Detective Sanchez changed topics, asking defendant whether victim had ever seen his penis.  Defendant stated that, on one occasion, he had urinated in the backyard because the bathroom was occupied and that victim had seen him.  Defendant also explained that victim had once opened the door to his room while he was watching pornography and masturbating.  When Detective Sanchez accused defendant of touching victim during that incident defendant said "No, no . . . it's impossible that I touch a girl like that at that age."  The following exchange ensued:

"[Detective Sanchez]:  We know that you did touch her.  Yes, right?

"[Defendant]:  Yes well when I moved her. [¶] . . . [¶]

"[Detective Sanchez]:  Okay.  And you grabbed her in that area, your hand went inside the shorts, so your hand also touched her vagina right?

"[Defendant]:  It could be that I touched her.

"[Detective Sanchez]:  Yes?

"[Defendant]:  It could be.

"[Detective Sanchez]:  How did it feel?  Was it--was it a little uh how do you say uh hot?  Like you know--you know what it feel[s] like right?  You've touched a vagina before?  (Inaudible)

"[Defendant]:  Yes.

"[Detective Sanchez]:  What does it feel like?

"[Defendant]:  No well it isn't, that was quick.  No, no.

5

"[Detective Sanchez]: What does it feel like when you touch a vagina? It is warm? Or is it?

"[Defendant]: Well when well when you touch a vagina well the (inaudible) well a vagina is hot. [¶] . . . [¶]

"[Detective Sanchez]: Okay. So your fingers are going to feel well. They're going to feel if it's cold or if--if it's hot. It's going--it's going to feel that it's smooth, right? Yes or no?

"[Defendant]: Yeah.

"[Detective Sanchez]: How did it feel? That's what I'm asking.

"[Defendant]: No I just felt smooth when I--when I released her.

"[Detective Sanchez]: It--it felt smooth?

"[Defendant]: Yeah. [¶] . . . [¶]

"[Detective Sanchez]: [W]hen you grabbed her and (inaudible) her vagina, did your--your fingers (inaudible) went inside a little, right?

"[Defendant]: It could be, yes. [¶] . . . [¶]

"[Detective Sanchez]: When you touched her like this, did your fingers go inside her vagina a little?

"[Defendant]: Well I don't know if it was her vagina or if it was in her butt. [¶] . . . [¶]

"[Detective Sanchez]: And how did it feel?

"[Defendant]: Well the same. I just [went] to--when I grabbed her like this I even--I went like this. I (inaudible) Eee . . . I grabbed her butt."

Detective Sanchez testified that, at that point, defendant put his hand to his nose, prompting Detective Sanchez to ask: "And what did your fingers smell like?" Defendant responded: "And they didn't--didn't smell of anything." The interrogation took place at about 7:00 p.m., approximately two hours after defendant was arrested, and lasted about one hour. During that time defendant did not ask to stop the interview, nor did he request

6

food or water.

Following the interview, defendant wrote a letter to victim's parents, which was read aloud by Detective Sanchez at trial. In the letter, defendant explained that victim had seen his penis when he was urinating outside and again when she walked in on him masturbating. He also wrote that "[s]he got on the bed with dirty feet and upon picking her up I touched her part, but it was without wanting to." He asked for their forgiveness and explained he would never hurt their children.

### 4. *Carl Lewis*

Carl Lewis, a consultant on child abuse issues and a former deputy sheriff, testified for the prosecution as an expert in child sexual abuse accommodation syndrome. Lewis testified that children who are sexually abused may exhibit unexpected or counterintuitive behavior, including minimizing or retracting their allegations.

### 5. *Defendant's Wife*

Defendant's wife, Mayra, testified for the defense. She testified that defendant told her that he urinated outside and that victim saw him. She further testified that defendant told her victim had opened the door to their room while he was masturbating. Mayra said that, about six months after defendant's arrest, he wrote her a letter admitting to an affair with victim's mother.

### 6. *Defendant*

Defendant testified in his own defense. He testified that he and victim's mother began a sexual relationship three or four months before his arrest in November 2010. Defendant attempted to break off the relationship in late October and again in mid-November. He testified that victim's mother threatened to do something to make him sorry if he ended the relationship.

With regard to victim, defendant testified that she once witnessed him urinate in the backyard. He testified that, on another occasion, victim walked in on him while he was watching pornography and masturbating. At the time, defendant thought he had

7

covered himself up in time to prevent victim from observing him.  Lastly, defendant testified about the incident in which he lifted victim off his bed because she was dirty. Defendant denied penetrating victim's vagina or buttocks as he lifted her off the bed. When asked whether he may have done so by accident defendant responded "No." Defendant acknowledged that he told Detective Sanchez he may have touched her buttocks "since it had all happened so quickly, I told him that maybe I just hadn't noticed."

### C.      *Jury Instructions*

Defendant requested the court instruct the jury with CALCRIM No. 225, which concerns the use of circumstantial evidence to prove intent.  The court declined to give the instruction for two reasons.  First, the court stated "this is a general intent crime, and there is just no question about it.  It is a general intent crime.  I do not think [CALCRIM No.] 225 is appropriate."  Second, the court reasoned that the case largely involved direct evidence and that circumstantial evidence did not play "a major role."

The court also refused defendant's request to instruct the jury with CALCRIM No. 251, which must be given if the crime requires a specific mental state.  Again, the court reasoned, "[i]t's not a specific intent crime and I'm not going to give an instruction that says it is."  Instead, the court instructed the jury with CALCRIM No. 250, a general intent instruction.

### D.      *Verdict*, *Sentencing*, *and Appeal*

After deliberating for less than a full day, the jury returned a guilty verdict.  On November 2, 2012, the court imposed a sentence of 15 years to life in prison.

Defendant timely appealed.

### E.      *Motion for Expert Funds*

Defendant moved this court for funding for an expert on false confessions and an expert psychologist to evaluate defendant and determine whether his character is consistent with that of a typical child molester.  This court denied that motion.

8

## II.    DISCUSSION

### A.    *Instructional Error*

Defendant contends the trial court made four errors in its jury instructions. We address each challenge in turn.

#### 1.    *CALCRIM No. 251*

First, defendant argues the trial court erred in failing to instruct the jury with CALCRIM No. 251, which provides a defendant may be found guilty of the crime only if he or she intentionally committed the prohibited act with the required intent or mental state, as explained in the instruction for the crime.[2] The People agree that jurors should have been instructed with CALCRIM No. 251 because sexual penetration of a child under the age of 10 includes as an element that defendant penetrated the victim for the purpose of sexual arousal, gratification, or abuse. However, the People maintain that the omission of CALCRIM No. 251 rendered the jury instructions as a whole merely ambiguous, not erroneous. For that argument, the People rely on the fact that the trial court instructed the jury with CALCRIM No. 1128, which defines sexual penetration, for purposes of the charged crime, as penetration "for the purpose of sexual abuse, arousal, or gratification." Defendant responds that the instructions were unambiguously erroneous because they included CALCRIM No. 250, which relates to general intent

---

[2] CALCRIM No. 251 provides in full:  "The crime[s] [(and/or) other allegation[s]] charged in this case require proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crime[s] (in this case/ of *<insert name[s] of alleged offense[s] and count[s], e.g., burglary, as charged in Count 1>* [or to find the allegation[s] of *<insert name[s] of enhancement[s]>* true]), that person must not only intentionally commit the prohibited act [or intentionally fail to do the required act], but must do so with a specific (intent/ [and/or] mental state).  The act and the specific (intent/ [and/or] mental state) required are explained in the instruction for that crime [or allegation]. [¶] *<Repeat next paragraph as needed>* [¶] [The specific (intent/ [and/or] mental state) required for the crime of *<insert name[s] of alleged offense[s] e.g., burglary>* is *<insert specific intent>*.]"

9

crimes, and not the specific intent instruction in CALCRIM No. 251.[3]

### a. Standard of Review

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) The pertinent inquiry is whether the instructions as a whole fully and fairly set forth the applicable law. (*Ibid.*) In making that determination, we assume that jurors are intelligent persons capable of understanding and correlating all jury instructions which are given and, where reasonably possible, we interpret the instructions to support the judgment. (*Ibid.*)

Where an instruction is erroneous, we must determine whether the error was prejudicial. There are two standards for assessing prejudice--the harmless-beyond-a-reasonable-doubt test (*Chapman v. California* (1967) 386 U.S. 18, 24) that applies to errors violative of the United States Constitution, or the reasonable-probability test (*People v. Watson* (1956) 46 Cal.2d 818, 836-837) that applies to error under California law. Where the error is the omission of "an element of [the] offense," such as the requisite mental state, it "is subject to harmless error analysis under *Chapman*." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663.)

Where jury instructions are ambiguous or internally inconsistent, and therefore subject to an erroneous interpretation, we assess whether there is a " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.) If there is such a reasonable

---

[3] CALCRIM No. 250, as given to the jury in this case, provides in full: "The crime charged in this case and the lesser offense of battery require proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crime or lesser offense in this case, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he intentionally does a prohibited act; however, it is not required that he intend to break the law. The act required is explained in the instruction for that crime."

10

likelihood, then we consider whether the instructional ambiguity was prejudicial. (*People v. Williams* (2000) 79 Cal.App.4th 1157, 1171.) If the ambiguous or conflicting instructions relate to "the mental state element of an alleged offense [and] can act to remove that element from the jury's consideration, the instructions constitute a denial of federal due process and invoke the *Chapman* 'beyond a reasonable doubt' standard for assessing prejudice." (*People v. Maurer* (1995) 32 Cal.App.4th 1121, 1128; see also *People v. Larsen* (2012) 205 Cal.App.4th 810, 829-830; *People v. Lee* (1987) 43 Cal.3d 666, 676 [applying *Chapman* in an attempted murder case where "the jury was originally told that a specific intent to kill was required, and then erroneously instructed that proof of such intent was unnecessary if implied malice was demonstrated"].)

### b.  Analysis

As the parties acknowledge, "sexual penetration of a child under 10 is a specific intent crime, requiring the jury to find the defendant penetrated the victim 'for the purpose of sexual arousal, gratification, or abuse.' " (*People v. Ngo* (2014) 225 Cal.App.4th 126, 161 (*Ngo*), quoting § 289, subd. (k)(1); *People v. McCoy* (2013) 215 Cal.App.4th 1510, 1538.) Accordingly, the trial court should have instructed the jury with CALCRIM No. 251, which the Judicial Council bench notes explain " '**must** be given if the crime requires a specific mental state . . . .' " (*Ngo, supra,* at p. 162.) And, as the parties further acknowledge, the court should not have instructed the jury with CALCRIM No. 250, which the Judicial Council bench notes explain " '**must not** be used if the crime requires a specific mental state . . . .' " (*Ngo, supra,* at p. 162.)

The first dispute on appeal is whether the omission of CALCRIM No. 251 and the inclusion of CALCRIM No. 250 rendered the jury instructions erroneous or merely ambiguous. That determination, in turn, dictates the proper standard of review. This court addressed an identical dispute in *Ngo*. There, as here, the jury in a sexual penetration of a child prosecution was properly instructed with CALCRIM No. 1128, but improperly instructed with CALCRIM No. 250 instead of CALCRIM No. 251. In

11

assessing the instructions, this court noted that CALCRIM No. 250 "does not explicitly tell the jury that *no additional level of intent is required* for a conviction" and that CALCRIM No. 1128 properly specifies "the required specific intent."[4] (*Ngo*, *supra*, 225 Cal.App.4th at p. 162.) Thus, this court concluded, the trial court "did not give the jury two directly *conflicting* instructions" (*id.* at pp. 162-163), but " 'ambiguous [instructions] . . . subject to an erroneous interpretation.' " (*Id.* at p. 163.)

Here, as in *Ngo*, the jury instructions were, at worst, ambiguous as they related to the requisite intent. The jury was instructed that defendant could be found guilty only if (1) he acted with wrongful intent in that he intentionally did the prohibited act (i.e., sexually penetrated victim) (CALCRIM No. 250) and (2) he performed the prohibited act for the purpose of sexual abuse, arousal, or gratification (CALCRIM No. 1128). Instead, the jury should have been instructed per CALCRIM No. 251 that defendant could be found guilty only if he intentionally committed the prohibited act (i.e., sexually penetrated victim) with a specific intent to do so for the purpose of sexual arousal, gratification, or abuse. As this discussion illustrates, the given instructions did not remove the mental state element from the jury's consideration. To the contrary, they properly set forth the requirement that the penetration be for the purpose of sexual abuse, arousal, or gratification and nothing in CALCRIM No. 250 negated that requirement.

Because the instructions were ambiguous, we consider whether there is a reasonable likelihood the jury applied the instructions in an unconstitutional manner. In

---

[4] CALCRIM No. 1128, as given to the jury in this case, provides: "The defendant is charged with engaging in sexual penetration with a child 10 years of age or younger. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant engaged in an act of sexual penetration with [victim]; [¶] 2. When the defendant did so, [victim] was 10 years of age or younger; [¶] 3. At the time of the act, the defendant was at least 18 years old. [¶] *Sexual penetration* means penetration, however slight, of the genital or anal opening of the other person by any foreign object, substance, instrument, device, or any unknown object for the purpose of sexual abuse, arousal, or gratification. . . ."

12

our view, there is not. We see little *practical* difference between the incorrect formulation given by the trial court and correct CALCRIM No. 251 formulation. The jury was instructed that defendant must have acted *intentionally* and *for the purpose of sexual abuse*, *arousal*, *or gratification*. It simply was provided these parameters in two separate instructions (CALCRIM No. 250 and CALCRIM No. 1128) as opposed to in a single instruction (CALCRIM No. 251). "If we assume, as we must, that ' "the jurors [were] intelligent persons and capable of understanding *and correlating* all jury instructions . . . given," ' " then we can only conclude that there is no reasonable likelihood they misapplied the instructions. (*People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1089.) Accordingly, we reject defendant's first claim of error.

> ### 2. *CALCRIM No. 225*

Second, defendant asserts the trial court erred by refusing to instruct the jury with CALCRIM No. 225, which provides guidance as to the use of circumstantial evidence in concluding whether a defendant possessed the required intent or mental state.[5] The People respond that the instruction was not warranted because the case against defendant was based primarily on direct evidence--namely, victim's testimony.

Where criminal knowledge is shown only by circumstantial evidence, the trial court is required to instruct the jury on the rules of law applicable to circumstantial evidence. (*People v. Yrigoyen* (1955) 45 Cal.2d 46, 49-50.) However, a trial court is not required to so instruct "where the alleged circumstantial evidence is incidental to, and corroborative of, direct evidence." (*People v. Malbrough* (1961) 55 Cal.2d 249, 251.)

---

[5] Defendant argues in the alternative that the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 224, which "provide[s] essentially the same information on how the jury should consider circumstantial evidence [as does CALCRIM No. 225]," but does not relate solely to intent or mental state. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1172.) Because we agree with defendant that the trial court should have instructed the jury with CALCRIM No. 225, we need not consider this alternative argument.

"Indeed, where circumstantial inference is not the primary means by which the prosecution seeks to establish that the defendant engaged in criminal conduct, the instruction may confuse and mislead, and thus should not be given." (*People v. Anderson* (2001) 25 Cal.4th 543, 582.) Thus, the court erred with respect to CALCRIM No. 225 only if the People relied primarily on circumstantial evidence to prove defendant penetrated victim for the purpose of sexual arousal, gratification, or abuse.

Direct evidence is evidence that "can prove a fact by itself." (CALCRIM No. 223.)[6] In the context of intent, direct evidence may take the form of an "admission, [a] confession, [or the defendant's] testimony." (*People v. Woods* (1991) 226 Cal.App.3d 1037, 1052.) Not surprisingly, such evidence rarely exists, and thus "intent can seldom be proved by direct evidence." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 299.) Instead, it generally must be "established by circumstantial evidence." (*People v. Swearington* (1977) 71 Cal.App.3d 935, 949.) "Circumstantial evidence does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question." (CALCRIM No. 223.)

At trial, the prosecution's theory was that defendant penetrated victim for the purpose of sexual gratification. The prosecutor argued in his closing argument that the penetration was "sexual" because it "occurred when the defendant was engaging in sexual conduct. He was touching himself. He was masturbating. He was looking at porn." Evidence of that version of events included victim's testimony and her statements to Detective Sanchez. That evidence is circumstantial because it may logically and reasonably support the inference that defendant penetrated victim for the purpose of sexual gratification. Contrary to the People's contention on appeal, that evidence does

_____

[6] The jury was instructed with CALCRIM No. 223, which defines direct and circumstantial evidence.

14

not *itself* prove what motivated defendant, and thus is not properly characterized as direct evidence of his intent.[7]

For the foregoing reasons, we agree with defendant that the trial court erred by failing to instruct the jury with CALCRIM No. 225 regarding circumstantial evidence. But reversal is required only if that error was prejudicial. To determine whether the instructional error prejudiced defendant, we apply *Watson*, asking whether there is a reasonable probability that defendant would have obtained a better outcome had jurors been given the circumstantial evidence instruction. (*People v. Rogers* (2006) 39 Cal.4th 826, 885-886 [applying *Watson* harmless error standard to erroneous failure to instruct on the sufficiency of circumstantial evidence].)

CALCRIM No. 225 provides, in relevant part, "before you may rely on circumstantial evidence to conclude that the defendant had the required (intent/ [and/or] mental state), you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required (intent/ [and/or] mental state). If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required (intent/ [and/or] mental state) and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required (intent/ [and/or] mental state) was not proved by the circumstantial evidence."

---

[7] In their brief, the People state: "The masturbation incident was the child's observations of appellant's conduct, not merely circumstantial evidence of intent." That contention belies a fundamental misunderstanding of the distinction between direct and circumstantial evidence. Not all testimony is direct evidence of every fact. Whether a particular piece of testimony qualifies as direct evidence depends on the fact to be proved. For example, victim's testimony that she saw milk come out of defendant's penis is direct evidence of the fact that defendant ejaculated in her presence. But it is only circumstantial evidence that, when he penetrated victim, he did so to satisfy his sexual desires.

15

CALCRIM No. 225 could have benefitted defendant "only if there were room for some 'rational conclusion' that" defendant put his finger in victim's vagina for a nonsexual purpose. (*People v. Green* (1964) 228 Cal.App.2d 437, 440.) Put differently, the pertinent inquiry is could the jury have concluded that the evidence was reasonably susceptible to an innocent explanation?

According to defendant, the evidence was reasonably susceptible to the innocent explanation that he accidentally touched victim's vagina when he picked her up. But the evidence supporting that conclusion was quite weak; it consisted of defendant's letter to victim's parents and his statements to Detective Sanchez (depending on how one perceives them). But the accident theory was weakened by defendant's trial testimony that he did *not* touch victim by accident. And, even if believed, defendant's theory explains only a single incident, whereas victim identified at least two incidents to her mother and Detective Sanchez. Given the weakness of the evidence that defendant penetrated victim's vagina for a nonsexual reason, we conclude there is no reasonable probability of a different result had the jury been given the circumstantial evidence instruction. (*People v. Rogers*, *supra*, 39 Cal.4th at p. 886 [error in failing to instruct on sufficiency of circumstantial evidence was harmless where "evidence pointing toward innocence was weak"]; *People v. Breverman* (1998) 19 Cal.4th 142, 177 [in applying *Watson*, "an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result."].)

### 3. *Accident Jury Instruction*

Third, defendant maintains the trial court erred by failing to instruct the jury on the defense of accident. While defendant did not request such an instruction below, the People do not argue forfeiture. Accordingly, we shall consider the merits of the argument on appeal. We independently review a claim that a trial court erred in failing to give an

16

instruction.  (*People v. Booker* (2011) 51 Cal.4th 141, 181.)

Trial courts have a limited duty to instruct, sua sponte, on particular defenses. (*People v. Barton* (1995) 12 Cal.4th 186, 195.)  That duty arises " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' "  (*Ibid*.)  "When the trial court believes there is substantial evidence supporting a defense that is inconsistent with that advanced by the defendant, the court should ascertain from the defendant whether he or she wishes instructions on the alternative theory."  (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1424.)  " 'Substantial evidence' in this specific context is defined as evidence which is 'sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable men could have concluded' " that the particular facts underlying the instruction did exist.' "  (*People v. Burnham* (1986) 176 Cal.App.3d 1134, 1139.)

An accident defense generally " 'amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime.' "  (*People v. Jennings* (2010) 50 Cal.4th 616, 674.)  Accordingly, our Supreme Court has held that where "the jury received complete and accurate instructions on the requisite mental element of the offense, the obligation of the trial court . . . to instruct on accident extend[s] no further than to provide an appropriate pinpoint instruction upon request by the defense."  (*People v. Anderson* (2011) 51 Cal.4th 989, 998.)  Here, with regard to the requisite mental state, the jury instructions were ambiguous.  As discussed above, there is no reasonable probability the jury misapplied the instructions.  However, the instructions were not "complete and accurate."  (*Ibid*.)  Therefore, if defendant relied on an accident defense or there was substantial evidence supporting such a defense, then the trial court erred by failing to sua sponte instruct the jury as to accident.

As discussed above, at trial, defendant denied accidentally penetrating victim. Nevertheless, defense counsel arguably asserted an accident defense in his closing

argument, stating: "if I fell down and, in falling down, . . . there was a child there and . . . [I] happened to [penetrate] a young girl's vagina" that is not a crime.[8] And defendant's letter to victim's parents and statements to Detective Sanchez may constitute substantial evidence supporting an accident defense. Accordingly, we assume for purposes of this appeal that the trial court erred in failing to sua sponte instruct the jury on the defense of accident.

That error was harmless under any standard. The jury was instructed that defendant could be convicted only if any penetration was "for the purpose of sexual abuse, arousal, or gratification." That instruction precluded the jury from convicting defendant if it concluded he penetrated victim accidentally. Moreover, both the prosecutor and defense counsel acknowledged in their closing arguments that accidental penetration is insufficient to support a conviction. (See *People v. Lee*, *supra*, 43 Cal.3d at p. 677 [finding instructional error to be harmless based in part on the closing arguments of counsel]; *People v. Hayes* (2009) 171 Cal.App.4th 549, 560 ["Closing arguments to the jury are relevant in assessing prejudice from instructional error."].) In light of the instructions as a whole and the closing arguments, we find the court's failure to instruct regarding accident to be harmless beyond a reasonable doubt.

### 4. Deliberation Jury Instruction

Fourth, defendant maintains the trial court erred by instructing the jury that it could not consider the lesser offense of battery before coming to a consensus on the greater offense of sexual penetration.

---

[8] The prosecutor acknowledged in his closing argument that accidental penetration is lawful, stating: "[t]his wild, crazy example that the defense suggests, falling down and . . . inserting your finger into a vagina . . . I suppose that is a lawful penetration because there was no purpose in it . . . it was a pure one hundred percent accident. . . . [¶] But all of the actions of the defendant in this case were purposeful."

### a. Pertinent Facts

With respect to deliberations, the court instructed the jury as follows: "If all of you find that the defendant is not guilty of the greater charged crime, you may find him guilty of a lesser crime if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime. . . . [¶] Battery . . . is a lesser crime of sexual penetration with a child 10 years of age or younger. [¶] It is up to you to decide the order in which you consider the crime and the relevant evidence, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime." That instruction parallels CALCRIM No. 3517. However, in CALCRIM No. 3517, the final sentence in the instruction reads "It is up to you to decide the order in which you consider *each crime* and the relevant evidence," as opposed to "the crime."

Following closing arguments, the court further informed the jury "there is a lesser-included offense in this case. And you can talk about the matters any way you want, but to vote you first must vote on the charged offense. And if you find the defendant guilty of that, then that's the end of it. If you can't reach a decision on that, that's also the end of it. [¶] If you find the defendant not guilty, then you would vote on the misdemeanor lesser-included offense of battery. [¶] . . . [¶] So you would only get to [the portion of the verdict form related to battery] if you found him not guilty of the charged offense."

Defendant did not object to the instruction or the additional remarks.

### b. Forfeiture

The People argue defendant forfeited any objection to the court's instruction and remarks by failing to object below. Defendant counters that the instruction and comments constituted instructional errors affecting his substantial rights, such that his complaints are cognizable on appeal.

" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.] But that rule does

19

not apply when . . . the trial court gives an instruction that is an incorrect statement of the law." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1112.) Defendant contends the instruction misstated the law. Accordingly, we may reach the merits of his contention.

### c. Merits

Under *People v. Kurtzman* (1988) 46 Cal.3d 322, 332, a jury "may consider charges in any order it wishes to facilitate ultimate agreement on a conviction or acquittal," but "may not return a verdict on lesser offenses unless it has unanimously agreed on a disposition of the greater [offense]." A trial court correctly guides a jury when it instructs the jury that it can deliberate in any order it wishes but must determine guilt in a certain order, specifically it must acquit of the greater offense before returning a verdict on a lesser included offense. (*People v. Wharton* (1991) 53 Cal.3d 522, 573.)

Defendant complains that the instruction was incorrect because it stated jurors could consider "the crime" as opposed to "the crimes" (sexual penetration and battery) in any order. He contends the jurors would have understood "the crime" as referring to the greater offense of sexual penetration and would not have understood that they could consider both battery and sexual penetration in any order. Defendant maintains that the court's later comments compounded the error by requiring a "vote" on the charged offense before any "vote" on the lesser-included offense of battery. According to defendant, that comment improperly precluded the jury from taking tentative votes during deliberations. The People's position appears to be that the court's use of the word "vote" was shorthand for "return a verdict."

In our view, the instruction and comments were ambiguous, at worst. With respect to the order in which deliberations could proceed, the instruction itself should have told jurors they could consider "the crimes"--plural--in any order. While the instruction referred only to "the crime," later in the same sentence it correctly referenced the "lesser crime" and "the corresponding greater crime." Moreover, the court's later comment clarified that "you can talk about the matters any way you want." Reasonable

20

jurors would have considered the instruction and comment together and understood that they could consider the greater and lesser crimes in any order. With respect to voting, we agree with defendant that jurors may vote as a part of their deliberations. (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 75 ["[i]t is certainly not unheard of that a foreperson may actually take a vote as deliberations begin to acquire an early sense of how jurors are leaning."].) Accordingly, jurors cannot properly be precluded from taking informal votes as to a lesser included offense before acquitting the defendant of the greater offense. However, the full context of the court's comment indicates it was referring, not to informal votes taken during deliberation, but to the manner in which the jury was to return its verdicts after completing its deliberations. We believe a reasonable juror would have understood the comment in that fashion. For the foregoing reasons, "[n]o reasonable likelihood exists the jury construed the challenged instruction in a manner contrary to the rule of *People v. Kurtzman*, *supra*, 46 Cal.3d 322." (*People v. Dennis* (1998) 17 Cal.4th 468, 537.) "Consequently, we find no merit to defendant's contention the jury's deliberations were channeled improperly toward a . . . conviction [on the greater crime] to the exclusion of [the] lesser offense[]." (*Ibid.*)

### E.    *Cumulative Error*

Defendant contends the cumulative effect of the trial court's asserted errors was to deprive him of his right to due process under the federal Constitution. Under the "cumulative error" doctrine, we reverse the judgment if there is a "reasonable possibility" that the jury would have reached a result more favorable to the defendant absent a combination of errors. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 ["Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial."].) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

21

Taking all of defendant's claims into account, we are satisfied that he received a fair adjudication. Defendant was "entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) While instructional error did occur, we are convinced his trial was fair.

## III. WRIT PETITION

In his petition for a writ of habeas corpus, defendant contends his trial counsel's representation fell below the standards for effective assistance because counsel (1) did not attempt to suppress defendant's interrogation statements on involuntariness grounds, and (2) did not argue that those statements were false. Defendant further maintains this court deprived him of due process by denying his request for expert funding.

### A. *Ineffective Assistance of Counsel*

#### 1. *Legal Principles*

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish both that his counsel's performance was deficient and that he suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms." (*Id.* at p. 688.) With respect to prejudice, a defendant must show "there is a reasonable probability"--meaning "a probability sufficient to undermine confidence in the outcome"--"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.)

#### 2. *Failure to Move to Suppress Statements to Detective Sanchez*

Defendant first contends his counsel rendered ineffective assistance by failing to move to suppress his statements to the investigating officer and failing to retain an expert

22

on false confessions to support such a motion.[9] Defendant asserts his concessions that "[p]erhaps" and "[i]t could be" he touched victim's vagina when he lifted her off his bed were the involuntary product of coercive interrogation tactics and should not have been admitted at trial. To prevail on that claim, defendant must show that reasonably competent counsel would have moved to suppress those admissions, the motion would have been successful, and an outcome more favorable to him was reasonably probable had his statements been excluded. (*People v. Grant* (1988) 45 Cal.3d 829, 864-865.)

"A confession or admission is involuntary, and thus subject to exclusion at trial, only if it is the product of coercive police activity." (*People v. Williams* (1997) 16 Cal.4th 635, 659 (*Williams*).) In other words, "involuntariness requires coercive activity on the part of the state or its agents[] and [that] such activity [was] the 'proximate cause' of the statement in question, and not merely a cause in fact." (*People v. Mickey* (1991) 54 Cal.3d 612, 647.) In deciding the question of voluntariness, we apply a " 'totality of [the] circumstances' " test. (*Williams*, *supra*, at p. 660.) Among the relevant circumstances are "the characteristics of the accused" (e.g., age and education) and "the details of the interrogation" (e.g., "the length of detention," "the repeated and prolonged nature of the questioning," and "the use of physical punishment such as the deprivation of food or sleep"). (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226.)

---

[9] Defendant refers to his statements to Detective Sanchez as both "admissions" and as a "confession." CALJIC No. 2.70 explains the distinction between confessions and admissions: "A confession is a statement made by a defendant in which [he] [she] has acknowledged [his] [her] guilt of the crime[s] for which [he] [she] is on trial. In order to constitute a confession, the statement must acknowledge participation in the crime[s] as well as the required [criminal intent] [state of mind]. [¶] An admission is a statement made by [a] [the] defendant which does not by itself acknowledge [his] [her] guilt of the crime[s] for which the defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence." Here, defendant never acknowledged touching victim "for the purpose of sexual abuse, arousal, or gratification." Accordingly, we will refer to his pretrial statements as admissions.

23

Defendant contends Detective Sanchez employed two coercive tactics to extract involuntary admissions--deception and promises of leniency. It is undisputed that Detective Sanchez deceived defendant by falsely telling him that DNA evidence showed he had touched victim's vagina. "Lies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession, but they are not per se sufficient to make it involuntary." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240.) "Where the deception is not of a type reasonably likely to procure an untrue statement, a finding of involuntariness is unwarranted." (*People v. Farnam* (2002) 28 Cal.4th 107, 182.) Courts have deemed lies similar to Detective Sanchez's DNA ruse to be insufficiently coercive to be likely to prompt a false confession. (*Ibid.* [deception concerning defendant's fingerprints]; *People v. Thompson* (1990) 50 Cal.3d 134, 167 [officers repeatedly lied regarding physical evidence linking defendant to the crime]; *People v. Smith* (2007) 40 Cal.4th 483, 506 [police falsely told suspect a gun residue test produced a positive result].) We follow suit.

The second type of coercion raised by defendant is promises of leniency. "[A] statement is involuntary and inadmissible when the motivating cause of the decision to speak was an express or clearly implied promise of leniency or advantage." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1088.) " 'Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise[] does not . . . make a subsequent confession involuntary.' " (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1401.) The police may point out benefits that "flow[] naturally from a truthful and honest course of conduct," but if they suggest that the defendant "might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible." (*People v. Hill* (1967) 66 Cal.2d 536, 549.)

24

Defendant contends Detective Sanchez implicitly promised leniency in exchange for incriminating statements on multiple occasions. Defendant relies, first, on Detective Sanchez's statement: "I am also Mexican [like you] . . . . And that is why I am here talking with you so that I can communicate better with you . . . . And so that I can help you, but you can also help me by being honest." Defendant argues the clear implication of that statement was that Detective Sanchez would help defendant avoid punishment if he confessed because they were both Mexican. We disagree. Detective Sanchez's suggestion that he could "help" defendant was too vague to be considered a promise of any tangible benefit for telling the truth. (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1212 (*Vance*) [no "implied promise of leniency" in "statement that '[w]e are here to listen and then to help you out' "].) And his remark about being Mexican--an obvious attempt to build rapport with defendant--was not "inherently coercive." (*People v. Williams* (2010) 49 Cal.4th 405, 447.) That these remarks were not coercive here is evidenced by the fact that they were made well before defendant conceded that he may have touched victim's privates in the process of removing her from the bed. Thus, even assuming the comments above constituted an implicit promise of leniency, the record indicates they did not motivate defendant to make any admissions. (*People v. Tully* (2012) 54 Cal.4th 952, 986 [statements deemed involuntary only when proximately caused by a promise of leniency].)

The second comment defendant points to is Detective Sanchez's statement "it could be that by telling me everything completely about what happened (inaudible) better for you." Defendant takes that comment out of context. Detective Sanchez stated, in full: "I don't have any power uh over what is going to happen . . . I don't control that, but you . . . being a responsible adult, it could be that by telling me everything completely about what happened (inaudible) better for you." The surrounding context reveals that Detective Sanchez made no promise and was referring only to the "peace of mind defendant and others would have after he did the right thing and gave his side of the

story.  That is not coercion." (*Vance*, *supra*, 188 Cal.App.4th at p. 1212.)

The third set of comments defendant complains of, in which Detective Sanchez repeatedly minimized the seriousness of defendant's alleged conduct, is closer to the " 'fine' " line between permissible and impermissible interrogation tactics.  (*People v. Holloway* (2004) 33 Cal.4th 96, 117.)  Detective Sanchez downplayed the allegations by telling defendant "[w]e're not saying that you are a bad person, okay.  We're not saying that you raped her or that you hit her very badly and that you're a criminal.  The only thing that we're saying is that something happened."  Detective Sanchez also told defendant "if you touched her" that's "fine" and "if you touched her" "[t]here is no problem."  In diminishing the seriousness of the alleged crime, Detective Sanchez did not make any express or implicit promises or threats.  For example, he did not indicate it would be "fine" or there would be "no problem" *only if* defendant admitted to touching victim.  In short, nothing in his statements constitutes a *quid pro quo* promise to defendant in exchange for a confession.

Finding no implicit promise of leniency, the question remains whether Detective Sanchez's minimization techniques were sufficiently coercive to induce defendant into admitting that he may have touched victim's vagina when he lifted her off his bed.  The totality of the circumstances convince us that, in this particular case, Detective Sanchez's tactics did not cause in defendant a level of mental coercion sufficient to render his statements involuntary.  The interrogation lasted just one hour and occurred in the early evening, just a couple of hours after defendant was arrested.  There is little in the record about the relevant characteristics of the defendant, leaving us with no basis for concluding he was especially susceptible to potentially coercive interrogation techniques.

For the foregoing reasons, we conclude that defendant's statements during the police interview were voluntary, such that a motion to suppress those statements-- whether or not supported by expert testimony--would have been futile.  Thus, we find no

merit in defendant's claim of ineffective assistance of counsel based upon defense counsel's failure to bring a motion to suppress.

### 3. Failure to Retain an Expert and Argue False Confession

Defendant's second claim of ineffective assistance of counsel is based on his counsel's failure to argue that he falsely confessed and to retain an expert on false confessions to support that argument.

In fact, defense counsel did attempt to cast doubt on the reliability of defendant's interview statements during cross-examination of Detective Sanchez. Specifically, defense counsel questioned Detective Sanchez extensively about the various interrogation tactics defendant now challenges as coercive. In doing so, he portrayed the tactics as improper trickery.

As to counsel's failure to retain an expert, the United States Supreme Court has recognized "a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility." (*Crane v. Kentucky* (1986) 476 U.S. 683, 689.) *Crane* held the reliability of a confession and its voluntariness are two separate questions, reliability being a factual issue for the jury and voluntariness being a legal issue for the court. (*Id*. at p. 688.) Nevertheless, the record shows a rational tactical basis for trial counsel's decision not to call an expert on coercive interrogation techniques.[10] Unlike in *Crane*, where the exclusion of evidence precluded

---

[10] Defendant has not submitted a declaration from his trial counsel as part of his petition for writ of habeas corpus. Rather, he submits a declaration from his appellate counsel, which recounts a conversation with defendant's trial counsel. According to appellate counsel's declaration, defendant's trial counsel stated he "did not pursue consultation with a false confession expert both because (1) the video of the complaining witness was extremely persuasive to the jurors, and (2) because [defendant's] statements were not a 'confession' per se." That declaration is inadmissible hearsay that cannot support a prima facie case for habeas relief. (*People v. Madaris* (1981) 122 Cal.App.3d 234, 242, disapproved on other grounds in *People v. Barrick* (1982) 33 Cal.3d 115, 127, superseded by statute as stated in *People v. Collins* (1986) 42 Cal.3d 378, 393 [appellate (continued)

27

the defendant from presenting any evidence regarding the circumstances surrounding the taking of his statement, here, the jury heard an audio recording of the entire interrogation and had the opportunity to review a transcript of that recording. (*Id.* at p. 692.) Moreover, as noted, defense counsel cross-examined Detective Sanchez extensively regarding his interrogation techniques. Defense counsel could reasonably have concluded the court would not admit expert testimony on coercive interrogation techniques on the theory that lay jurors "could understand and evaluate all the evidence . . . without the assistance of an expert on police interrogation." (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1207 [court did not err in excluding expert testimony about false confessions where defendant claimed false confession induced by purportedly improper promises of leniency].) Put differently, defense counsel may reasonably have concluded the trial court would consider the proposition that, faced with lies about the existence of DNA evidence, an innocent person might offer a speculative or untrue explanation for such evidence to be a matter within the ken of lay jurors. (*People v. Son* (2000) 79 Cal.App.4th 224, 241 [court did not err in excluding expert testimony about false confessions where defendant testified he falsely confessed because police promised he would "serve no more than one year in custody--a matter easily understood by a layperson without expertise"].) Accordingly, we conclude defendant has not carried his burden of demonstrating that counsel's failure to call an expert witness fell below an objective standard of reasonableness.

### B. *Due Process Claim*

Finally, defendant contends this court deprived him of due process by denying his request for funds to hire two experts in connection with his writ petition. The basis for

attorney's sworn statement conveying an unsworn statement by trial counsel offered to prove the truth of the matter stated cannot support a prima facie case for habeas relief].) We therefore disregard it. (*People v. McCarthy* (1986) 176 Cal.App.3d 593, 597 [allegations in the petition based on hearsay must be disregarded].)

defendant's request is *Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, in which our Supreme Court held that the right to counsel includes the right to effective counsel and thus the right to ancillary defense services such as expert witnesses that are shown to be reasonably necessary in preparation of a defense. (*Id.* at p. 319.) The court further held that, accordingly, indigent defendants are entitled to public funds for those reasonably necessary ancillary defense services. (*Id.* at p. 320.)

Defendant has not shown the experts are reasonably necessary. Defendant has not demonstrated that an expert on false confessions is reasonably necessary for the reasons discussed above in part III.A.3. Defendant also sought funds for an expert psychologist. Under *People v. Stoll* (1989) 49 Cal.3d 1136, 1161, "[e]xpert opinion that [a] defendant[] show[s] no obvious psychological or sexual problem is circumstantial evidence which bears upon whether [he or she] committed sexual acts upon children, and is admissible 'character' evidence." Defendant contends expert opinion testimony that he is not a sexual deviant is reasonably necessary to his habeas petition because it will enable him to show his trial counsel provided ineffective assistance by not retaining a *Stoll* expert. But even if we assume that not hiring such an expert constituted deficient performance, defendant does not even argue that the presentation of expert testimony that he is not a sexual deviant would have resulted in a better outcome at trial. In other words, he does not contend trial counsel's supposed deficient performance was prejudicial, as is required to establish an ineffective assistance of counsel claim.

We cannot conclude funds to hire a *Stoll* expert are reasonably necessary to defendant's habeas corpus petition, where defendant merely contends those funds will allow him to establish deficient performance (i.e., *half* an ineffective assistance of counsel claim).

## IV. DISPOSITION

The judgment is affirmed. The petition for writ of habeas corpus is denied.

29

_____
Premo, Acting P.J.

WE CONCUR:

_____
Elia, J.

_____
Mihara, J.