Filed 3/13/25  P. v. Machuca CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062663 |
| v. | (Super. Ct. No. 18NF2695) |
| CESAR ALEXANDER MACHUCA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Jonathan S. Fish, Judge. Affirmed and remanded with directions.

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Eric Tran, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Cesar Alexander Machuca of 12 counts of lewd acts with a child under the age of 14 (Pen. Code, § 288, subd. (a); all further statutory references are to this code). His charges involved two victims. The trial court sentenced Machuca to 105 years to life imprisonment.

On appeal, Machuca raises issues regarding the admissibility of expert testimony and instructional error. He also contends his sentence constitutes cruel and/or unusual punishment. We conclude the trial court did not abuse its discretion in allowing the expert testimony and did not err in providing jury instructions regarding Child Sexual Abuse Accommodation Syndrome (CSAAS) testimony (CALCRIM No. 1193) and charged sex offense evidence (CALCRIM No. 1191B). We also conclude his sentence does not constitute cruel and/or unusual punishment.

Additionally, Machuca and the Attorney General agree, as do we, paragraph 6, subdivision (a), of the abstract of judgment should be corrected. We also agree with Machuca and the Attorney General, the trial court erred by not imposing sentences on counts 11 and 12 prior to staying execution of those sentences under section 654. Under the circumstances here, we exercise our authority to modify the judgment and impose sentences of 15 years to life imprisonment on counts 11 and 12 and stay execution of those sentences under section 654. The abstract of judgment also should be corrected to reflect the convictions on counts 11 and 12 and the stay of execution of the sentences of 15 years to life on counts 11 and 12. In all other respects, we affirm.

FACTUAL AND PROCEDURAL HISTORY[1]

I.

CHARGES

In an amended information, the district attorney charged Machuca with 12 counts of lewd acts upon a child under the age of 14 (§ 288, subd. (a)). In counts 1 through 9, the amended information alleged Doe 1 was the victim and the offenses occurred between September 1, 2016 and July 1, 2017. In counts 10 through 12, the amended information alleged Doe 2 was the victim and the offenses occurred between January 1, 2010 and December 31, 2011. As to each count, the amended information alleged, pursuant to section 667.61, subdivisions (b) and (e), Machuca committed a lewd act upon a child under the age of 14 against more than one victim. The amended information further alleged certain factors in aggravation for each count.

II.

NON-EXPERT TESTIMONY AT TRIAL

At trial, Doe 1 testified she lived in an apartment with, among others, her parents and sibling, her uncle (Machuca), and Machuca's wife and children. Doe 1 said the first time Machuca touched her vagina was when she was 11 years old and had gone to the swimming pool with Machuca and his son, who was about 4 years old. Doe 1 stated, while in the pool, she felt Machuca's erection with her buttocks, and he inserted his fingers into her vagina and squeezed her breasts. Doe 1 said it was skin to skin when Machuca touched her vagina and breasts.

---

[1] Our summary of facts is limited to the facts relevant to the issues presented in this appeal.

Doe 1 testified Machuca touched her vagina with his hands more than 20 times. Doe 1 said she washed dishes in the kitchen about three times a week, and Machuca would touch her vagina with his hands every time she would wash dishes or go to get something in the kitchen. Doe 1 stated, "[w]hen [she] was washing the dishes, and [Machuca] would come up behind [her], and he would press his body against [hers]. He would insert his fingers into [her] vagina, on [her] breasts, and he would kiss [her] neck." Doe 1 stated the touching of her breasts and vagina was skin to skin. Doe 1 said this happened every time she washed the dishes. Doe 1 stated, when Machuca touched her that way, it lasted for about seven or eight minutes, and she "didn't do anything" and "couldn't react" and "just was, like, frozen without being able to do anything." Doe 1 stated she did not say anything when he touched her that way because she was afraid.

Doe 1 testified about one incident where she brought food to Machuca's room, and he touched her vagina and breasts, both over the clothes, and kissed her neck.

Doe 1 testified she and her family moved into a different apartment when she was 12 but Machuca continued to touch her; Machuca's touching stopped when she "was 12 years old going on 13." Doe 1 said, in 2018, her mother asked why she was harming herself so she told her mother about the touching. Doe 1 stated this was the second time she had been caught harming herself, and she was afraid she was going to get in trouble again. Doe 1 also said, in 2017, after she was caught harming herself, she spoke to a social services worker and denied being physically, emotionally, or sexually abused.

Doe 2 testified she is Machuca's cousin, and when she was about 11 years old, she spent a night at the house of her aunt, who is Machuca's

4

mother. Doe 2 said at the time the people living in the house were her aunt, someone else, Machuca, and Machuca's girlfriend and son. Doe 2 said she went to sleep that night in her aunt's room. Doe 2 shared a bed with her brother, Machuca's son was sleeping in a different bed, and her aunt was sleeping on the floor. Doe 2 testified she woke up to Machuca sitting on the floor and touching her leg, and the next thing she remembered was Machuca crawled into bed next to her. Doe 2 said Machuca groped her breasts and touched her buttocks over the clothes. Doe 2 stated Machuca kissed her lips and after she pushed him away, he left.

Doe 2 testified she did not immediately tell anybody what had happened. However, Doe 2 said the next day her aunt (Machuca's mother) asked Doe 2 about the night before, and Doe 2 said Machuca "did do something" but Doe 2 did not "tell [her aunt] in detail." Doe 2 said her aunt took Doe 2 to Machuca's room and made him apologize, which he did, and her aunt told Doe 2 not to tell anybody. Doe 2 said Machuca gave her a hug after apologizing.

Doe 2 testified she eventually told a school counselor when she was 14 years old. Doe 2 also said she spoke to a police officer in 2018, and she told the police officer she had been dreaming of something crawling on her leg and had mixed memories about what had occurred. Doe 2 stated at some point she had been harming herself and told the police officer she had no reason to be cutting herself. Doe 2 also testified she told the police officer Machuca "'went up [her] leg and that's all [she] remember[s,]'" and when the officer asked if he touched her breast, she responded yes.[2]

---

[2] The jury also heard testimony from the mother of Doe 1, the father of Doe 2, and a police officer.

Machuca testified and denied sexually abusing Doe 1 or Doe 2. He denied ever taking Doe 1 to the pool and was never in the pool alone with Doe 1. He denied ever touching Doe 1 in the pool, kitchen, or anywhere. He also denied ever going into a bedroom where Doe 2 was sleeping and denied ever touching or kissing Doe 2.

## III.

### EXPERT WITNESS TESTIMONY REGARDING CSAAS

Jody Ward, who is a clinical and forensic psychologist, testified.[3] Ward testified CSAAS "is a pattern of behaviors that many children exhibit who have been sexually abused" and there are five components: secrecy, helplessness, entrapment and accommodation, delayed unconvincing disclosure, and retraction or recantation.

Ward said "[s]ecrecy refers to the fact that all sexual abuse occurs in secret with only the perpetrator and the child there at the time that the abuse occurs. Very rarely is there a co-perpetrator involved or someone there that actually can witness the sexual abuse and take action to stop it from occurring." Ward noted "[s]ecrecy also refers to the fact that children keep the secret of sexual abuse for very long periods of time." Ward said "[h]elplessness refers to the power differential that's inherent between children and adults" and "also refers to the fact that children are completely reliant and dependent on the adults around them for everything." Regarding accommodation and entrapment, Ward noted children "have to learn other ways to cope with the ongoing sexual abuse[,]" and children may, inter alia, "acquiesce or go along with the sexual abuse" or disassociate. Regarding

---

[3] Before and during trial, Machuca objected to the introduction of CSAAS testimony. These objections were overruled by the trial court.

delayed unconvincing disclosure, Ward testified "the research has shown that two-thirds of children wait until adulthood to report sexual abuse" and "[o]nly one-third report during childhood." Ward further stated, "[w]hen a child or an adult makes a disclosure of sexual abuse, that disclosure can be tentative or hesitant. In other words, a child is—or someone is not going to come out with every single detail of every single sexual behavior that occurred the first time the person makes a disclosure." Ward also said "when children are remembering episodes of sexual abuse, they tend to lump all of their memories into kind of a script, they call it, or just a memory of what normally occurred" and "they don't tend to have memories of this particular time, this particular day, these particular acts happened." Ward noted a common coping mechanism is for children to actively try to forget the sexual abuse. Regarding retraction or recantation, Ward stated a child "may backpedal[,]" try to soften the impact of allegations, or may completely recant.

Ward indicated she did not know any of the facts of this case. Ward also confirmed CSAAS is not to be used in hindsight for determining whether abuse occurred and she was not drawing any conclusions about whether any sexual abuse occurred in this case.

IV.

VERDICT AND SENTENCING

The jury convicted Machuca on all counts and found to be true as to each count the multiple victim allegation pursuant to section 667.61,

7

subdivisions (b) and (e).[4] The trial court sentenced Machuca to 105 years to life based on consecutive sentences of 15 years to life for counts 1, 5, 6, 7, 8, 9, and 10.[5] As to counts 2, 3, and 4, the trial court imposed sentences of 15 years to life and stayed execution of those sentences under section 654. As to counts 11 and 12, the trial court stayed the sentences under section 654, without indicating any term for these counts prior to staying their execution.

## DISCUSSION

On appeal, Machuca argues the trial court erred in allowing the prosecution to present expert testimony regarding CSAAS and in providing a jury instruction based on CALCRIM No. 1193 and CALCRIM No. 1191B. He also asserts his sentence constitutes cruel and/or unusual punishment. We disagree with these agreements. We also address the abstract of judgment and sentencing on counts 11 and 12.[6]

---

[4] Machuca waived his right to a jury trial on the alleged aggravating factors. After a court trial on these factors, the trial court found the aggravating factor under California Rules of Court, rule 4.421, subdivision (a)(3) (vulnerable victim), to be true as to all counts. It also found to be true the aggravating factor under rule 4.421, subdivision (a)(11) (position of trust and confidence), on counts 1 through 9 but not true as to counts 10 through 12.

[5] Prior to sentencing, Machuca filed a sentencing brief arguing, inter alia, a sentence beyond 30 years to life would constitute cruel and unusual punishment.

[6] At our invitation, the Attorney General and Machuca filed supplemental briefing regarding counts 11 and 12 and the abstract of judgment.

8

# I.

## CSAAS TESTIMONY

*A. The Admission of CSAAS Testimony*

On appeal, Machuca argues the trial court erred by permitting Ward to testify regarding CSAAS because such testimony was not necessary or relevant in this case. "A trial court's decision to admit evidence is reviewed for abuse of discretion. [Citation.] There are varying degrees of deference within the abuse of discretion standard of review. [Citation.] A 'trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.'" (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 170 (*Lapenias*).)

"Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse. [Citation.] While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*Lapenias, supra,* 67 Cal.App.5th at p. 171; see also *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 ["CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation"].) "Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*People v. Patino, supra,* at pp. 1744–1745; see also *People v. Flores* (2024) 101 Cal.App.5th 438, 458 ["the defense placed

9

the victims' credibility at issue using precisely the kind of 'paradoxical' behaviors, including delayed reporting, helplessness, and memory repression, that CSAAS testimony is admissible to address"].)

Here, the credibility of Doe 1 and Doe 2 was put at issue, including in part because of testimony related to delayed and partial disclosure. Doe 1 testified she was molested by Machuca numerous times before she eventually disclosed the abuse. Doe 2 testified she told her aunt the next day Machuca "did do something" but she did not provide the details, and her report to a school counselor occurred a few years later.

Machuca contends he "did not attack [Doe 1] and [Doe 2's] credibility on the grounds that they did not immediately disclose the abuse, or that they did not behave in a way that one would expect a victim of abuse to behave[,]" and he "did not challenge the alleged victims' behavior as being paradoxical or assert that they should not be believed because they had maintained their relationships with [him] after the molestations occurred." However, that Machuca did not expressly argue Doe 1's and Doe 2's behavior was paradoxical does not make CSAAS testimony irrelevant. Machuca's counsel questioned and elicited testimony from Doe 1 and Doe 2 in ways that put their credibility at issue and related to the CSAAS testimony. On cross-examination of Doe 1, Machuca's counsel elicited testimony from Doe 1 that she denied she had been sexually abused when she spoke to a social worker in 2017. On cross-examination of Doe 2, Machuca's counsel elicited testimony from Doe 2 that, when she spoke to the police officer in 2018, she said she was dreaming of something crawling on her leg and had mixed memories about the incident, and she told the police officer Machuca "'went up [her] leg and that's all [she] remember[s].'" Thus, the trial court did not abuse its discretion in admitting Ward's CSAAS testimony, which was relevant.

10

*B. CALCRIM No. 1193*

The trial court provided the following instruction based on CALCRIM No. 1193: "You have heard testimony from Dr. Ward regarding [CSAAS]. [¶] Dr. Ward's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [Doe 1] and [Doe 2's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

On appeal, Machuca focuses on the clause "and in evaluating the believability of their testimony" and asserts it unfairly bolstered Doe 1's and Doe 2's believability and "informed the jurors that they *could* in fact use the CSAAS evidence to prove that [Doe 1] and [Doe 2's] claims were true." "We review instructional error claims under a de novo standard of review. [Citation.] 'The proper test for judging the adequacy of instructions is to decide whether the trial court "fully and fairly instructed on the applicable law . . . .""" (*Lapenias, supra,* 67 Cal.App.5th at p. 175.)

As discussed, "CSAAS evidence 'is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.'" (*Lapenias, supra,* 67 Cal.App.5th at p. 175.)

A panel of this court previously recognized "[c]ourts have held the pattern jury instruction accurately informs the jury on the limited use of CSAAS evidence, but the instruction does not: (a) improperly allow an alleged minor victim of sexual abuse to corroborate her own testimony; (b) violate due process; or (c) misapply the burden of proof." (*Lapenias, supra,* 67

11

Cal.App.5th at p. 175.) As *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*) explained, "[a] reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use Ward's testimony to conclude that [the victim's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use Ward's testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes Ward's testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Id.* at p. 504.) In *Lapenias*, the panel of this court agreed with *Gonzales* and concluded "the official jury instruction accurately instructs the jury on the law: the proper use—and the proper limitations on the use—of CSAAS evidence." (*Lapenias, supra,* 67 Cal.App.5th at pp. 175–176.) We similarly agree the instruction provided by the trial court here properly instructed the jury on the law.

Additionally, Machuca claims CALCRIM No. 1193 is contrary to the trial court's pretrial oral statement about a limiting instruction. In a pretrial ruling regarding admissibility of CSAAS testimony, the trial court stated: "This is pretty basic. So CSAAS . . . evidence is admissible in a limited way. . . . Dr. Ward or Rogers may testify after the victim—alleged victim 1, alleged victim 2 testify—well, after at least one victim testifies. [¶] Should the credibility be expressly or impliedly attacked—both are female doctors— she may testify only as to the syndrome in general, not as to how it may relate to this specific case or any of the facts of this case. [¶] And I will read a limiting instruction prior to the testimony of either of those doctors, something to the effect of as follows: 'If you choose to believe the testimony of

12

Dr.'—let's say 'Dr. Ward, you can only use it for the narrow and limited purpose to explain that the timing of the claims of the alleged victim or victims is not necessarily inconsistent with having suffered sexual abuse. This evidence is not to be used in any way to prove that any sexual abuse occurred or that the alleged victim or victims' claims of sexual abuse is or are true.' [¶] That's the Court's ruling."

We do not find the trial court's pretrial oral statement to be materially inconsistent with CALCRIM No. 1193. The trial court's pretrial oral statement was an overview, not the exact words of an instruction, as underscored by its remark it would give "something to the effect of" the following instruction. Machuca focuses on the trial court's pretrial oral statement the CSAAS testimony was "'not to be used in any way to prove . . . the alleged victim or victims' claims of sexual abuse is or are true[,]'" but read in context, the trial court was simply summarizing that the CSAAS testimony could not be used to prove Doe 1 and Doe 2 were, in fact, sexually abused. As discussed, the trial court properly instructed the jury on this issue, and the jury "would understand it cannot use Ward's testimony to conclude [the victim] was, in fact, molested." (See *Gonzales, supra,* 16 Cal.App.5th at p. 504; see also *People v. Williams* (2000) 79 Cal.App.4th 1157, 1171 ["we presume jurors are able to and do follow the court's limiting instructions"].)[7]

---

[7] Moreover, Machuca has not explained how, even if the trial court's pretrial oral statement could be construed as a misstatement of the law, it was prejudicial and unfair where the trial court provided the proper instruction to the jury.

## II.

## CALCRIM No. 1191B

Machuca argues the trial court erred by providing a jury instruction based on CALCRIM No. 1191B.[8] However, Machuca acknowledges the California Supreme Court "approv[ed] a modified version of CALCRIM No. 1191, which is similar to the instruction used in this case[,]" in *People v. Villatoro* (2012) 54 Cal.4th 1152, and he "recognizes that this Court is bound to follow the precedent set in *Villatoro*." Machuca notes he "nevertheless seeks to preserve his federal constitutional claim that the instruction allowing a jury to use charged offenses to infer that he committed the other offenses charged in the same case violates his due process right to a fundamentally fair trial under the Fourteenth Amendment." Machuca further says he is raising "this issue here in order to request the California Supreme Court to reconsider its decision in *Villatoro* in light of the dissent of Justice Corrigan joined by Justice Werdegar, and the dissent of Justice Liu."

As Machuca noted and as a panel of this court previously recognized, "[w]e are bound to follow California Supreme Court precedent pursuant to *Auto Equity Sales, Inc. v. Superior Court* [(1962) 57 Cal.2d 450,

---

[8] The trial court provided the following instruction: "The People presented evidence that the defendant committed the crimes as alleged in the Information. [¶] If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case. [¶] If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge and allegation beyond a reasonable doubt."

14

455], in concluding the trial court did not err by instructing the jurors they may consider proven similarly charged sex offenses as evidence of [the defendant's] propensity to commit other charged offenses." (*People v. Meneses* (2019) 41 Cal.App.5th 63, 68.)

## III.

### CRUEL AND/OR UNUSUAL PUNISHMENT

Machuca contends his sentence of 105 years to life imprisonment constitutes cruel and/or unusual punishment under the California and United States Constitutions. "Special laws on the subject of sexual abuse of children have been enacted describing the types of acts that may be deemed criminal sexual misconduct. These laws "'generally operate without regard to force, fear, or consent.'" [Citation.] The act of setting prison terms for specific crimes 'involves a substantive penological judgment that, as a general matter, is "properly within the province of legislatures, not courts."' [Citation.] When considering a claim that a particular sentence amounts to cruel and unusual punishment, we give substantial deference both to the Legislature's broad authority to determine the parameters for the punishments for crimes, and to the trial court's discretion in imposing specific sentences. [Citation.] 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.'" (*People v. Gomez* (2018) 30 Cal.App.5th 493, 499 (*Gomez*).)

*A. The California Constitution*

Article I, section 17 of the California Constitution states "[c]ruel or unusual punishment may not be inflicted or excessive fines imposed." A punishment may violate the California Constitution's prohibition on cruel or unusual punishment "if, although not cruel or unusual in its method, it is so

15

disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) "*Lynch* describes three 'techniques' to determine whether a sentence is so disproportionate to the crime as to constitute cruel or unusual punishment. [Citation.] We first consider 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.'" (*People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*).)[9] "Next, we compare the sentence to 'punishments prescribed in the same jurisdiction for different offenses which, by the same test, must be deemed more serious.' [Citation.] Finally, we compare the sentence 'with the punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision.' [Citation.] The weight afforded to each prong may vary by case. [Citation.] 'Disproportionality need not be established in all three areas.'" (*Ibid.*, italics omitted.)

As to the first technique, Machuca concedes the offenses "were very serious[,]" but he asserts his sentence is a de facto life-without-parole sentence and unconstitutional "in light of his personal responsibility and moral guilt." He contends "[t]he single 2010 incident with [Doe 2] involved touching over her clothing" and "underlays the jury's multiple victim finding for all of the offenses resulting in seven consecutive 15-years-to-life

---

[9] "In examining the nature of the offense, we '"look at the totality of the circumstances, including motive, the way the crime was committed, the extent of the defendant's involvement, and the consequences of defendant's acts."' [Citation.] In examining the nature of the offender, we consider '"whether 'the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind.'"'" (*Gomez, supra,* 30 Cal.App.5th at p. 500.)

16

sentences." He also says the offenses "did not involve overt violence, the use of deadly weapons, or threats of violence." He argues he "only had a single conviction for a DUI from 2013 on his record[,]" "had worked steadily as a cabinet assembler for 17 years to support his family[,]" and had a low risk of reoffending.

However, Machuca was convicted of multiple offenses against two victims involving a serious offense. "Along a spectrum ranging from murder, mayhem, and torture on one end to petty theft on the other, 'lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable.'" (*Baker, supra,* 20 Cal.App.5th at pp. 724–725.) Machuca, who lived with Doe 1 and is her uncle, molested her on multiple occasions, including touching her vagina while she was 11 to 12 years old. Machuca also groped the breasts, touched the buttocks, and kissed Doe 2, who is his cousin, when she was around 11 years old. Although Machuca argues the convictions involving Doe 2 only concerned kissing and touching over the clothes, that does not eliminate the seriousness of his conduct, let alone negate the egregiousness of his conduct in the offenses involving Doe 1. Moreover, Machuca's arguments regarding his criminal record and risk of reoffense are not determinative under these circumstances. (See *id.* at p. 725 [noting the defendant "had an 'insignificant criminal record' and no prior history of sex crimes" but those factors did "not outweigh the other factors"]; *People v. Christensen* (2014) 229 Cal.App.4th 781, 807 (*Christensen*) ["the lack of a prior criminal record is not determinative"].)

Additionally, relying on a concurrence by Justice Mosk in *People v. Deloza* (1998) 18 Cal.4th 585, Machuca asserts "[a] sentence that [he] cannot conceivably complete serves no retributive or penological purpose and disregards [his] intrinsic worth as a human being." However, Justice Mosk's

17

concurrence is not binding authority. (See *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383.) Instead, the "imposition of a sentence of life without possibility of parole[,]" which is what Machuca says his sentence is effectively, "in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal Constitution." (*Ibid.* [concluding sentence of 115 years plus 444 years to life was not cruel and/or unusual punishment and "serves valid penological purposes"]; see also *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230–1231 (*Retanan*) [concluding sentence of 135 years to life was not cruel and/or unusual punishment].)[10]

As to the second technique, Machuca contends he would have received a lesser sentence had he been convicted of first degree murder without special circumstances and "[t]he distinction between homicide and non-homicide offenses was disregarded in this case." Machuca's comparison to first degree murder is misplaced as he was convicted of multiple offenses against two victims. (See *Christensen, supra,* 229 Cal.App.4th at p. 808

---

[10] Machuca cites to *In re Rodriguez* (1975) 14 Cal.3d 639, in which the California Supreme Court concluded the defendant's imprisonment for 22 years for a violation of section 288 was unconstitutionally disproportionate and his continued imprisonment constituted both cruel and unusual punishment under the California Constitution. (*Id.* at pp. 642–643, 653–656.) *Rodriguez*, however, is distinguishable for multiple reasons, including because in *Rodriguez* "[t]he episode lasted only a few minutes." (*Id.* at p. 655.)

["'penalties for single offenses . . . cannot properly be compared to those for multiple offenses'"].)[11]

In sum, Machuca's sentence is not so disproportionate to his crimes that it shocks the conscience and offends fundamental notions of human dignity.

*B. The United States Constitution*

The Eighth Amendment of the United States Constitution states "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." While the difference in wording between the Eighth Amendment's prohibition on "cruel and unusual" punishment and the California Constitution's prohibition on "cruel or unusual" punishment "'"is purposeful and substantive rather than merely semantic"'" and we construe the provisions separately, "[t]here is considerable overlap in the state and federal approaches." (*Baker, supra,* 20 Cal.App.5th at pp. 723, 733.) "'Although articulated slightly differently, both standards prohibit punishment that is "grossly disproportionate" to the crime or the individual culpability of the defendant.' [Citation.] 'The touchstone in each is gross disproportionality.'" (*Id.* at p. 733.)

Specifically, "[t]he Eighth Amendment 'contains a "narrow proportionality principle," that "does not require strict proportionality between crime and sentence" but rather "forbids only extreme sentences that are 'grossly disproportionate' to the crime"' [Citation.] '[O]nly in the

---

[11] Machuca has not addressed the third technique. (See *Retanan, supra,* 154 Cal.App.4th at p. 1231 [noting the "defendant makes no effort to compare his sentence . . . with punishments in other states for the same offense, which we take as a concession that his sentence withstands a constitutional challenge on" that basis].)

19

"exceedingly rare" and "extreme" case' will a sentence be grossly disproportionate to the crime." (*Baker, supra,* 20 Cal.App.5th at p. 732.) "We begin an Eighth Amendment analysis 'by comparing the gravity of the offense and the severity of the sentence.' [Citation.] 'This analysis can consider a particular offender's mental state and motive in committing the crime, the actual harm caused to his victim or to society by his conduct, and any prior criminal history.'" (*Id.* at p. 733.)

Here, we conclude Machuca's challenge to his sentence under the Eighth Amendment fails for the same reasons his challenge under the California Constitution fails.

## IV.

### ABSTRACT OF JUDGMENT AND SENTENCING ON COUNTS 11 AND 12

Machuca asserts paragraph 6, subdivision (a), "of the abstract of judgment indicates that [he] was sentenced to serve 15 years to life sentences on counts 1 through 10[,]" and "[t]his is confusing and could be misinterpreted to mean that [he] was sentenced to serve a total of 150 years to life in state prison." The Attorney General agrees paragraph 6, subdivision (a), of the abstract of judgment should be corrected, stating "paragraph 6, subdivision (a), erroneously indicates [Machuca] was sentenced to serve 15 years to life on counts 1 through 10, which totals 150 years to life[,]" but "at sentencing, the trial court imposed only 105 years to life." We agree paragraph 6, subdivision (a), of the abstract of judgment should be corrected to reflect only the sentences of 15 years to life imprisonment for counts 1, 5, 6, 7, 8, 9, and 10 (which comprise the total sentence of 105 years to life imprisonment and do not include the stayed sentences). (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 ["appellate courts . . . that have properly assumed jurisdiction of cases have ordered correction of abstracts of

20

judgment that did not accurately reflect the oral judgments of sentencing courts"].)

Additionally, the abstract of judgment's attachment page, which contains a continuation of paragraph 1's listing of the convictions, does not list counts 11 and 12. The Attorney General and Machuca agree, as do we, the trial court erred by failing to impose sentences on counts 11 and 12 before staying execution of those sentences under section 654. (See *People v. Alford* (2010) 180 Cal.App.4th 1463, 1466 (*Alford*) ["when a trial court determines that section 654 applies to a particular count, the trial court must impose sentence on that count and then stay execution of that sentence"].)

Regarding the remedy for this error, Machuca states the trial court "imposed 15-years-to-life sentences for counts 2, 3, and 4, and then stayed those sentences under section 654[,]" and "[t]he record indicates that the trial court intended to do the same for counts 11 and 12 but simply neglected to first impose the 15-years-to-life terms before staying the sentences under section 654." Machuca recognizes "[t]his Court has the authority to correct" the omission and "[i]t appears that a remand for resentencing would not benefit [Machuca] or impact his aggregate sentence." The Attorney General similarly says remand is unnecessary and asserts, "[i]n the interest of judicial economy, this court should mirror the trial court's treatment of counts 2 to 4 and modify the judgment by imposing indeterminate terms of 15 years to life for counts 11 and 12 and staying execution of those sentences." Given the parties' arguments and the circumstances here, we exercise our authority to modify the judgment as follows: we impose sentences of 15 years to life imprisonment on counts 11 and 12 and stay execution of those sentences under section 654. (See *Alford*, *supra*, 180 Cal.App.4th at p. 1473 [exercising authority to modify judgment,

21

impose sentence, and stay execution of sentence]; § 667.61, subds. (b) & (e)(4).) Furthermore, paragraph 1 on the attachment page of the abstract of judgment should be corrected to reflect Machuca's convictions on counts 11 and 12 and the stay of execution of the sentences of 15 years to life imprisonment on counts 11 and 12.

## DISPOSITION

The judgment is modified by imposing and staying execution of the sentences on counts 11 and 12 as described in this opinion. The trial court is directed to prepare and file an amended abstract of judgment consistent with this opinion, which should also include a correction to paragraph 6, subdivision (a), to indicate only the sentences of 15 years to life imprisonment for counts 1, 5, 6, 7, 8, 9, and 10. The trial court is directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


MOTOIKE, J.

WE CONCUR:


GOETHALS, ACTING P. J.


SANCHEZ, J.


22